**No. 2025-1933**

# United States Court of Appeals for the Federal Circuit

**WSOU INVESTMENTS LLC, dba Brazos Licensing and Development,**
*Plaintiff-Appellant*

v.

**GOOGLE LLC,**
*Defendant-Appellee*

Appeal from the United States District Court for the Western District of Texas, Case No. 6:20-cv-00572-ADA

## APPELLANT WSOU INVESTMENTS LLC'S OPENING BRIEF

Joseph M. Abraham
joseph.abraham@foliolaw.com
Timothy Dewberry
timothy.dewberry@foliolaw.com
FOLIO LAW GROUP PLLC
13492 Research Blvd.
Ste. 120, No. 177
Austin, TX 78750
(737) 234-0201

Alexandra Fellowes
alexandra.fellowes@foliolaw.com
Moses Xie
moses.xie@foliolaw.com
FOLIO LAW GROUP PLLC
1200 Westlake Ave. N., Ste. 809
Seattle, WA 98109
(206) 880-1802

*Counsel for Plaintiff-Appellant*

**Language of (Exemplary) Patent Claims at Issue**

**U.S. Patent No. 8,041,806**

1. A system comprising:

a behavioral information collector operable to monitor communication traffic exchanged with a communication network subscriber over an access communication link, the access communication link enabling the subscriber to access electronic content, the behavioral information collector being configurable to collect from any of a plurality of types of communication traffic in the monitored communication traffic behavioral information indicative of behavior of the subscriber in using the access communication link;

a behavioral analyzer operatively coupled to the behavioral information collector and operable to maintain a behavioral profile of the subscriber that reflects ongoing behavior of the subscriber, based on behavioral information collected from only one or more particular types of the plurality of types of communication traffic in the monitored communication traffic, maintenance of the behavioral profile being unaffected by behavioral information collected from types of communication traffic other than the one or more particular types of communication traffic; and

an electronic content delivery controller operatively coupled to the behavioral analyzer and operable to control, based on the behavioral profile, delivery of targeted electronic content to the subscriber for presentation with electronic content accessed by the subscriber,

wherein at least one of the behavioral information collector, the behavioral analyzer, and the electronic content delivery controller is implemented using hardware,

wherein the access communication link comprises a network link in an access network, the access network comprising an electronic content source that is operable to deliver the accessed electronic content to the subscriber,

wherein the electronic content source provides an Internet Protocol Television (IPTV) service, and

wherein the electronic content delivery controller is further operable to select the targeted electronic content from targeted electronic content provided by multiple targeted electronic content providers.

3. The system of claim 1, wherein the monitored communication traffic comprises packet traffic, the system further comprising:

a Deep Packet Inspection (DPI) module operatively coupled to the behavioral information collector and operable to monitor the access communication traffic.

Case: 25-1933 Document: 6 Page: 1 Filed: 07/29/2025

**FORM 9. Certificate of Interest** | **Form 9 (p. 1) March 2023**

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2025-1933

**Short Case Caption** WSOU Investments LLC v. Google LLC

**Filing Party/Entity** WSOU Investments LLC

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.
5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 07/29/2025

Signature: /s/ Joseph M. Abraham

Name: Joseph M. Abraham

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☒ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| WSOU Investments LLC | | OT WSOU Terrier Holdings II, LLC |
| | | OCO Opportunities Master Fund, L.P. |
| | | WSOU Holdings, LLC |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☒ Additional pages attached

| | | |
|---|---|---|
| Justin Allen (Cherry Johnson Siegmund James LLC) | Steven Skelley (Folio Law Group PLLC) | Mark D. Siegmund (Cherry Johnson Siegmund James LLC) |
| Cliff Win (Folio Law Group PLLC) | C. Maclain Wells (Folio Law Group PLLC) | Gregory P. Love (Cherry Johnson Siegmund James LLC) |
| Ryan C. Johnson (Cherry Johnson Siegmund James LLC) | Craig D. Cherry (Cherry Johnson Siegmund James LLC) | Melissa S. Ruiz (Cherry Johnson Siegmund James LLC) |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ☒ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

**FORM 9. Certificate of Interest**

**25-1933**
**WSOU Investments LLC v. Google LLC**

**4. Legal Representatives (continued).**

Carter Arnett: Bradley D. Liddle, E. Leon Carter, Joshua J. Bennett, Linda R. Stahl, Michael C. Pomeroy, Scott W. Breedlove, Seth A. Lindner, Theresa M. Dawson, Nathan Cox

Etheridge Law Group: Brett A. Mangrum, Brian M. Koide, James L. Etheridge, Jeffrey Huang, Nathan K. Cummings, Ryan S. Loveless, Travis L. Richins

Rade LLC: Scott R. Maynard

## TABLE OF CONTENTS

STATEMENT OF RELATED CASES ..... xii

JURISDICTIONAL STATEMENT ..... xiii

STATEMENT OF ISSUES ..... 1

STATEMENT OF THE CASE ..... 2

I. The ’806 Patent ..... 2

A. Background ..... 2

B. Claim 1 ..... 5

C. Claim 3 ..... 7

II. Brazos’s Expert’s Validity Report ..... 7

III. Procedural History ..... 10

SUMMARY OF ARGUMENT ..... 13

ARGUMENT ..... 14

I. Standard of Review ..... 14

II. *Alice* Step One: Claims 1 and 3 of the ’806 Patent Are Not Directed to an Abstract Idea ..... 16

III. *Alice* Step Two: Claims 1 and 3 of the ’806 Patent Recite an Inventive Concept ..... 24

A. The District Court Erred by Finding No Fact Issue as to Whether the Arrangement of the “Behavioral Information Collector” Provides an Inventive Concept ..... 26

B. The District Court Erred by Failing to Apply the Plain and Ordinary Meaning of “Behavioral Information Collector” Before Finding No Inventive Concept ..... 29

C. The District Court Erred In Finding No Fact Issue as to Whether the Combination of DPI and IPTV Provides an Inventive Concept ........................................................................ 35

CONCLUSION AND STATEMENT OF RELIEF SOUGHT .............................. 36

## TABLE OF AUTHORITIES

### Cases

*Affinity Labs of Tex., LLC v. Amazon.com Inc.*,
838 F.3d 1266 (Fed. Cir. 2016) ........................................ 23

*Alice Corp. v. CLS Bank Int'l*,
573 U.S. 208 (2014)........................................ 10, 15, 24

*Amdocs (Isr.) Ltd. v. Openet Telecom, Inc.*,
841 F.3d 1288 (Fed. Cir. 2016) ........................................ 24

*Ancora Technologies, Inc. v. HTC America, Inc.*,
908 F.3d 1343 (Fed. Cir. 2018) ........................................ 23

*BASCOM Global Internet Services v. AT&T Mobility LLC*,
827 F.3d 1341 (Fed. Cir. 2016) ........................................ 1, 15, 24, 26

*Berkheimer v. HP Inc.*,
881 F.3d 1360 (Fed. Cir. 2018) ........................................ passim

*Bridge & Post, Inc. v. Verizon Commc'ns, Inc.*,
778 F. App'x 882 (Fed. Cir. 2019) ........................................ 19

*Brit. Telecomms. PLC v. IAC/InterActiveCorp*,
813 F. App'x 584 (Fed. Cir. 2020) ........................................ 19

*Coop. Entm't, Inc. v. Kollective Tech., Inc.*,
50 F.4th 127 (Fed. Cir. 2022) ........................................ 14, 15, 28

*Customedia Techs., LLC v. Dish Network Corp.*,
951 F.3d 1359 (Fed. Cir. 2020) ........................................ 19, 23

*Data Engine Techs. LLC v. Google LLC*,
906 F.3d 999 (Fed. Cir. 2018) ........................................ 23

*DDR Holdings, LLC v. Hotels.com, L.P.*,
773 F.3d 1245 (Fed. Cir. 2014) ........................................ 16, 19, 21

*Enfish LLC v. Microsoft Corp.*,
822 F.3d 1327 (Fed. Cir. 2016) ........................................ 16

*Free Stream Media Corp. v. Alphonso Inc.*,
996 F.3d 1355 (Fed. Cir. 2021) .......................................................................... 19

*In re Morsa*,
809 F. App’x 913 (Fed. Cir. 2020) .................................................................... 19

*In re TLI Commc’ns LLC Patent Litig.*,
823 F.3d 607 (Fed. Cir. 2016) ....................................................................... 14, 20

*Koninklijke KPN N.V. v. Gemalto M2M GmbH*,
942 F.3d 1143 (Fed. Cir. 2019) .......................................................................... 23

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
566 U.S. 66 (2012)................................................................................................ 15

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
837 F.3d 1299 (Fed. Cir. 2016) .......................................................................... 20

*Microsoft Corp. v. i4i Ltd. P'ship*,
564 U.S. 91 (2011)................................................................................................ 25

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) .......................................................................... 34

*PPS Data, LLC v. Jack Henry & Assocs.*,
404 F. Supp. 3d 1021 (E.D. Tex. 2019)............................................................... 27

*SRI International, Inc. v. Cisco Systems, Inc.*,
930 F.3d 1295 (Fed. Cir. 2019) .......................................................................... 23

*TecSec Inc. v. Adobe Inc.*,
978 F.3d 1278 (Fed. Cir. 2020) .......................................................................... 19

*Uniloc v. LG Elecs. USA, Inc.*,
957 F.3d 1306 (Fed. Cir. 2020) .......................................................................... 19

**Statutes**

35 U.S.C. § 101.............................................................................................. 10, 14

## STATEMENT OF RELATED CASES

Counsel for Appellant WSOU Investments LLC, dba Brazos Licensing & Development ("Brazos") is unaware of any other related case(s) pending in this or any other court that will directly affect or be affected by the decision on appeal.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a) and entered final judgment in favor of Appellee Google LLC, on June 12, 2025. Brazos timely appealed on July 14, 2025, and this Court has jurisdiction over that appeal under 28 U.S.C. § 1295(a)(1).

## STATEMENT OF ISSUES

Whether the district court erred in holding that all claims of the ’806 patent are ineligible under Section 101, where such claims are directed to improvements to computer-related technology at *Alice* step one, and where Brazos sufficiently demonstrated that factual issues existed regarding whether ordered combinations of claim elements were not well-understood, routine, and conventional at *Alice* step two, as addressed by this Court’s precedents in, *inter alia*, *BASCOM Global Internet Services v. AT&T Mobility LLC*, 827 F.3d 1341 (Fed. Cir. 2016).

## STATEMENT OF THE CASE

### I. The ’806 Patent

#### A. Background

United States Patent No. 8,041,806 (the “’806 patent”) issued on October 18, 2011, to inventors Michael Peter Gassewitz, Denny Lee, and Steven Edward Morin, then employed by the patent’s original assignee, Alcatel-Lucent. The ’806 patent was assigned to Appellant Brazos in 2017.

The ’806 patent is directed to solving a particular technical issue that had arisen within the larger field of delivery of targeted electronic content—namely, that data selected for use in a behavioral profile of a user were both too extensive and too shallow. The ’806 patent disclosed a new targeted electronic content delivery system capable of sampling subscriber communication traffic and profiling subscriber behavior.

In targeted electronic content delivery systems, electronic content (such as advertisements) is selectively delivered to internet users, often referred to as subscribers, based upon their individual interactions with web content. Appx71 at 5:1-10, 5:36-47. These interactions are collectively denominated as subscriber behavior. Appx69 at 1:47-55. Such behavior encompasses various digital activities, including, but not limited to, HyperText Transfer Protocol (HTTP) web traffic, Uniform Resource Locators (URLs) that have been input and visited, Really Simple Syndication

(RSS) feeds that have been followed, search phrases and search phrase sequences that have been input, click-throughs that have been performed, and online applications that have been signed. Appx76 at 15:39-45.

At the time of the invention, those skilled in the art utilized three distinct techniques for targeted electronic content delivery. The first approach was "advertisement delivery with search." This technique was practiced by connecting advertisement delivery to the user's immediate search activity. Appx69 at 1:24-27. However, this approach was limited because it failed to track subscriber behavior over time or outside the specific search context, and thus could not effectively capture information concerning a subscriber's ongoing buying intent or general personal interests. Appx69 at 1:36-39.

The second approach was "advertisement delivery with content." This method involved delivering advertisements based on the static content of the current webpage being viewed. Appx69 at 1:40-43. This approach was inherently deficient because it was unable to capture information regarding the ongoing buying intent or personal interest of the subscribers. Appx69 at 1:44-46.

Finally, the third approach was "advertisement delivery using a behavioral network." This technique involved establishing a network to track and profile user behavior across multiple websites. Appx69 at 1:21-23, 2:31-32, 1:46-55. This solution presented several drawbacks. One was that it demanded excessive computer

processing and memory resources, frequently requiring mechanisms such as cookies to be deposited on subscriber devices. Appx76 at 15:20-26. Another drawback with existing behavioral networks was that the network would become ineffective when users deliberately disabled cookies on their browsing devices. Appx76 at 15:20-26. The accuracy of the content delivery using a behavioral network method was thus limited, because it could sample only web activity occurring through participating portals, which often amounted to only a small fraction of a subscriber's total web activity. Appx69 at 1:56-59. Furthermore, existing behavioral networks' capacity for profiling subscriber behavior was restricted to specific traffic types, such as HTTP traffic, which further limited those networks' overall accuracy. Appx76 at 15:38-45.

The '806 patent presents an inventive targeted electronic content delivery system designed to overcome these prior art limitations, such as reliance on subscriber device resources (e.g., cookies) and incomplete traffic sampling. The inventive system positions a behavioral information collector ***outside*** of the subscriber devices 12-14 in either the access communication network 16 (Appx71 at 5:44-47 ("A behavioral information collector may be deployed 'inline' in the access communication link 26 at the access side or network side of the SME30, as shown at 28 and 32, respectively.")), or in the core communication network 18 (Appx71 at 5:48-51 ("A behavioral information collector 34 may also or instead be provided in an 'offline'

position, operatively coupled to the access communication link 26 but not itself part of that link.")). This is depicted in Figure 2:




The system of claim 3 utilizes an additional unconventional arrangement, including a Deep Packet Inspection (DPI) module and a behavioral information collector positioned remotely from the subscriber device. This solution enables the accurate profiling of a subscriber's complete web activity without burdening the computational resources of the subscriber device.

### B. Claim 1

Claim 1 of the '806 patent is broadly representative and recites:

**1.** A system comprising:

**[1.a]** a behavioral information collector operable to monitor communication traffic exchanged with a communication network subscriber over an access communication link, the access communication link enabling the subscriber to access electronic content, the behavioral information collector being configurable to collect from any of a plurality of types of communication traffic in the monitored

communication traffic behavioral information indicative of behavior of the subscriber in using the access communication link;

**[1.b]** a behavioral analyzer operatively coupled to the behavioral information collector and operable to maintain a behavioral profile of the subscriber that reflects ongoing behavior of the subscriber, based on behavioral information collected from only one or more particular types of the plurality of types of communication traffic in the monitored communication traffic, maintenance of the behavioral profile being unaffected by behavioral information collected from types of communication traffic other than the one or more particular types of communication traffic; and

**[1.c]** an electronic content delivery controller operatively coupled to the behavioral analyzer and operable to control, based on the behavioral profile, delivery of targeted electronic content to the subscriber for presentation with electronic content accessed by the subscriber,

**[1.d]** wherein at least one of the behavioral information collector, the behavioral analyzer, and the electronic content delivery controller is implemented using hardware,

**[1.e]** wherein the access communication link comprises a network link in an access network, the access network comprising an electronic content source that is operable to deliver the accessed electronic content to the subscriber,

**[1.f]** wherein the electronic content source provides an Internet Protocol Television (IPTV) service, and

**[1.g]** wherein the electronic content delivery controller is further operable to select the targeted electronic content from targeted electronic content provided by multiple targeted electronic content providers.

### C. Claim 3

Claim 3 of the ’806 patent adds a deep packet inspection (DPI) module operatively coupled to the behavioral information collector as part of the novel arrangement of components in the system:

3. The system of claim 1, wherein the monitored communication traffic comprises packet traffic, the system further comprising:

a Deep Packet Inspection (DPI) module operatively coupled to the behavioral information collector and operable to monitor the access communication traffic.

## II. Brazos’s Expert’s Validity Report

Brazos’s technical expert, Dr. William Mangione-Smith, rendered a Rebuttal Expert Report on the Validity Regarding U.S. Patent No. 8,041,806 on April 28, 2023. Therein, *inter alia* Dr. Mangione-Smith addressed eligibility under Section 101, based on the record evidence, including his unchallenged expert opinion testimony.

Regarding *Alice* step one, Dr. Mangione-Smith opined that claim 3[1] recited a technical solution to a technical problem and thus is directed to a computer-related improvement rather than an abstract idea. Dr. Mangione-Smith first observed the technical problems with prior art techniques: "prior technique use[] computer processing and memory resources by requiring cookies to be stored onto user devices" and were "limited in its accuracy because it could only sample user's web activity with respect to participating protals." Appx7288-7289 at ¶ 106. Prior techniques were also "limited in terms of the types of traffic that could be used for profiling." *Id.* Dr. Mangione-Smith observed how "[t]he '806 patent provides technological solutions to these technical challenges" by providing "an improved targeted electronic content delivery system that does not read or write cookies to, or otherwise burden or rely on, user devices." *Id.* at ¶ 107. Dr. Mangione-Smith identified the "technical components, such as the behavioral analyzer, the behavioral information collector, electronic content delivery controller, and DPI module, to realize the recited solution" via which the '806 patent achieves those goals. *Id.* Dr. Mangione-Smith also opined that "the inventors provide a targeted electronic delivery system that positions the behavioral information collector and operatively coupled deep packet

---

[1] In light of the district court's first summary judgment ruling dismissing all other asserted claims (*see infra* § III), Dr. Mangione-Smith's opinions as tendered are limited to claim 3—which as a dependent claim incorporates independent claim 1 by reference.

inspection (DPI) module outside of the user device in the access communication network or the … core communication network." *Id.* at ¶ 106. Based on this analysis, Dr. Mangione-Smith concluded that "[i]t is my opinion that claim 3 and the corresponding specification recite a technological solution to the technological problem I mentioned above." *Id.* at ¶ 107.

Regarding *Alice* step two, Dr. Mangione-Smith analyzed whether claim 3 recites additional elements and their ordered combinations that were not well-understood, routine, and conventional. Dr. Mangione-Smith identified two such unconventional ordered combinations: (1) the combination of DPI with other claimed components, including the behavioral information collector and behavioral profile elements; (2) the arrangement of the behavioral information collector in an access network remote from user device. Dr. Mangione-Smith observed that "claim 3 recites an unconventional arrangement of elements with the behavioral information collector and DPI module being remote from the user device." Appx7291 at ¶ 110. Dr. Mangione-Smith also stated that "[t]his unconventional arrangement enables improved communication traffic sampling and lessens computational resource usage … at the user device." *Id.* Dr. Mangione-Smith concluded that "[t]his recited location of the … behavioral information collector was not routine, conventional, or well-understood in the field of the invention." *Id.* Dr. Mangione-Smith further opined that combining DPI with other claim elements was "not routine,

convention[al], or well-understood in the field of the invention" because "prior targeted electronic content delivery systems deposited cookies onto user devices and did not use … DPI modules to build behavioral profiles." Appx7290-7291 at ¶ 109.

Google's expert Dr. Houh offered no opinion that the arrangement of the behavioral information collector external to the subscriber device ***was*** well-understood, routine, and conventional. *See generally* Appx7406-7417. Rather, Dr. Houh's opinions were limited to arguing that the elements were ***individually*** conventional. *E.g.*, Appx7409-7410 at ¶ 114 (opining "no component disclosed in the claims is unconventional."), Appx7410-7414 at ¶¶ 117-128 (opining that DPI, individually, "is a conventional technique").

### III. Procedural History

On August 27, 2021, Google moved for summary judgment of ineligibility of the '806 patent under 35 U.S.C. § 101 and *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208 (2014). Appx630-658. Brazos subsequently filed a cross-motion for summary judgment of eligibility of claim 3 of the '806 patent under 35 U.S.C. § 101 on July 27, 2022. Appx5720-5740. Following a hearing on February 16, 2023, the district court ruled that all claims except claim 3 were ineligible under Section 101, and with respect to Claim 3 held that the invention was not ineligible under *Alice* step one, and that *Alice* step two should go to the jury. Appx4-7 at 40:18-41:15. On June 28, 2023, Google moved for reconsideration of its summary judgment motion

with respect to claim 3, presenting the same arguments as in its initial motion. Appx7249-7270. At the Pretrial Conference on November 13, 2023, the court ultimately ruled that Claim 3 was also ineligible under Section 101. Appx8386 at 17:6-7. The court issued its memorandum and order, and accompanying final judgment, on June 12, 2025. Appx8-28, Appx29.

In the final order, the court held that the ’806 patent was both directed to abstract subject matter and lacked an inventive concept. With respect to *Alice* step one, the court held that the ’806 patent was abstract by relying heavily on cases that had previously held that patents “directed to presenting users with targeted content” were abstract. Appx17. The court characterized the invention of the ’806 patent as “tailoring the provision of information to a user’s characteristics,” which the court found was an abstract idea. Appx18. Specifically with respect to Claim 3, the court held that “Claim 3 merely recites the concept of monitoring the access communication traffic, without specificity as to how this is accomplished.” Appx20.

The court also implicitly construed claims 1 and 3 to allow for the behavioral information collector (and the Deep Packet Inspection module of claim 3) to be ***internal to the subscriber’s device***, despite intrinsic evidence demonstrating that the remote placement of the behavioral information collector is essential for the ‘806 patent to achieve its advancement over the described prior art. Appx21. The court further held under *Alice* step two that an inventive concept was lacking. Specifically,

the court determined that the claimed components did not provide a technological improvement to existing systems on the grounds that they were routine, conventional, and well understood—notwithstanding the fact that Dr. Mangione-Smith had opined that this particular combination of elements was not routine. Appx23.

## SUMMARY OF ARGUMENT

The district court erred in finding the ’806 patent ineligible under Section 101, with respect to both step one and step two of the court’s *Alice* analysis.

As to *Alice* step one, the claims of the ’806 patent are simply not abstract, contrary to the district court’s findings. Rather, the claims are directed to improvements to computer-related technology by providing specific technical solutions to problems necessarily rooted in computer technology. These improvements are effectuated by the claimed “behavioral information collector” and “behavioral analyzer,” which sample subscriber communication traffic and profile subscriber behavior in an improved manner, to deliver targeted electronic content. It was error for the district court to accept Google’s oversimplified view of the claimed invention, and to find the ’806 patent ineligible under *Alice* step one.

As to *Alice* step two, the district court’s opinion displays three distinct flaws. In the first instance, the district court committed a cardinal error for summary judgment, by granting Google’s motion based on supposedly clear and convincing evidence where Google submitted ***no record evidence*** concerning whether the ***arrangement of elements*** in the patented claims disclosed an inventive concept that was not “well-understood, routine, and conventional.” Rather, only Brazos provided expert evidence that positioning the behavioral information collector remotely from the subscriber device was in fact such an inventive concept.

Second, the district court apparently applied an implicit construction—which neither party requested, and which the court never disclosed—that permitted the behavioral information collector to be located on the subscriber device, in derogation of the asserted claim's plain and ordinary meaning.

Finally, as to asserted claim 3, the district court again ignored Brazos's again-unrebutted expert testimony that, e.g., the combination of claim 3's DPI module with IPTV constituted an inventive concept.

For these reasons, the district court's grant of summary judgment should be reversed.

## ARGUMENT

### I. Standard of Review

The ultimate question of patent eligibility is one of law, which this Court reviews *de novo*. *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 611 (Fed. Cir. 2016). However, underlying factual findings are reviewed for clear error. *Coop. Entm't, Inc. v. Kollective Tech., Inc.*, 50 F.4th 127, 130 (Fed. Cir. 2022) (citing *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1365 (Fed. Cir. 2018)).

This Court reviews the district court's determination of patent eligibility under 35 U.S.C. § 101 pursuant to a bifurcated standard. The test for patent eligibility is the two-step framework established in *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573

U.S. 208 (2014).[2] In *Alice* step one, the court must "determine whether the claims at issue are directed to [a] patent-ineligible concept[]." *Id.* at 217. In *Alice* step two, the court considers whether claims contain an "inventive concept" sufficient to "transform the nature of the claim into a patent-eligible application." *Id.* at 217-18 (quotation omitted). For this step, the court considers "the elements of each claim both individually and 'as an ordered combination'" to determine whether they are "'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Id.* (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 72-73 (2012)).

Further, "an inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces." *BASCOM Global Internet Servs., Inc.*, 827 F.3d at 1350. *See also Coop. Entm't, Inc. v. Kollective Tech., Inc.*, 50 F.4th 127, 133 (Fed. Cir. 2022) (finding inventive concept in arrangement of peer nodes outside of controlled networks because such arrangement and the benefits flowing therefrom did not exist in the prior art).

---

[2] Brazos observes that the Patent Eligibility Restoration Act of 2025 ("PERA") has been reintroduced in the 119th Congress. *See* S.1546. If enacted before this Court rules on the present appeal, PERA purports to substantially modify the application of Section 101 to inherently technical inventions such as claimed in the '806 patent. *See, e.g.*, *id.* § 2(5)(E)(ii) ("any process that cannot be practically performed without the use of a machine (including a computer) or manufacture shall be eligible for patent coverage"). Brazos reserves all rights to present arguments in the alternative should PERA ultimately be passed into law.

## II. *Alice* Step One: Claims 1 and 3 of the '806 Patent Are Not Directed to an Abstract Idea

The claims of the '806 patent are directed to specific improvements to computer-related capabilities: a new and inventive targeted electronic content delivery system capable of sampling subscriber communication traffic and accurately profiling subscriber behavior. *See Enfish LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335-36 (Fed. Cir. 2016) ("[T]he first step in the *Alice* inquiry in this case asks whether the focus of the claims is on the specific asserted improvement in computer capabilities (i.e., the self-referential table for a computer database) or, instead, on a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool."). The core inventive system of the '806 patent solved several significant technological shortcomings that had plagued the prior art, specifically that those systems provided an incomplete picture of subscriber traffic or inefficiently overburdened subscriber devices through reliance on mechanisms like cookies. Appx69 at 1:47-67. This problem is thus rooted in computer technology—i.e., internet communication traffic—and does not merely invoke computers as a tool to speed up or otherwise improve a process that does not otherwise necessarily involve computer technology. *See DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257 (Fed. Cir. 2014).

Crucially, the inventive system samples more complete communication traffic without overtaxing the computational resources of the subscriber devices by, for

example, eliminating exclusive reliance on reading and writing cookies. Appx69 at 1:47-67. This innovative architecture removes the processing and storage burden from the end user's device. Appx76 at 15:23-26. Moreover, the design achieves improved accuracy of subscriber behavior profiling by tracking and analyzing Web activity across all portals and traffic types. Appx76 at 15:33-37, 15:40-45.

As noted above, expert testimony sponsored by Brazos confirms claims 1 and 3 are directed to computer-related improvements by providing a technical solution to a technical problem. To start, Brazos's expert Dr. Mangione-Smith observed that the '806 patent described technical problems to prior art techniques: "prior technique use[] computer processing and memory resources by requiring cookies to be stored onto user devices" and were "limited in its accuracy because it could only sample user's web activity with respect to participating protals." Appx7288-7289 at ¶ 106. Prior techniques were also "limited in terms of the types of traffic that could be used for profiling." *Id.* Dr. Mangione-Smith then opined that "[t]he '806 patent provides technological solutions to these technical challenges" by providing "an improved targeted electronic content delivery system that does not read or write cookies to, or otherwise burden or rely on, user devices." Appx7289-7290 at ¶ 107. Dr. Mangione-Smith further opined that the technological improvement involved specific "technical components, such as the behavioral analyzer, the behavioral information collector, electronic content delivery controller, and DPI module, to realize the recited

solution." *Id.* As to the specificity of the claimed technology solution, Dr. Mangione-Smith also opined that "the inventors provide a targeted electronic delivery system that positions the behavioral information collector and operatively coupled deep packet inspection (DPI) module outside of the user device in the access communication network or the … core communication network." Appx7288-7289 at ¶ 106.

The patented system further enhances its technical efficiency by ensuring that this robust packet inspection capability does not result in the superfluous processing of irrelevant data. The inventive system is designed to intelligently pinpoint which subset of the communication data merits attention. As the '806 patent explicitly teaches, the "behavioral information collector could be configured to collect behavioral information from only certain types of traffic and/or to inspect monitored traffic for specific data or particular fields." Appx72 at 8:28-32. This selectivity represents a targeted technological refinement, enabling the collection of relevant behavioral information while conserving processing power within the network infrastructure itself. Thus, the '806 patent is directed to patent-eligible improvements to computer technology.

Thus, the district court erred in finding that the claims are "directed to the abstract idea of delivering targeted content to a subscriber." Appx17. In so finding, the district court incorrectly analogized the claims here to several Federal Circuit

cases finding claims directed to targeted content delivery to be abstract.[3] The '806 patent's claims at issue here are distinguishable. Rather than improve upon the abstract idea itself of tailoring content to the user, the claims here improve upon ***technological aspects of subscriber profiling*** by reciting specific technical components that solve a technical problem. The claims are directed to these technological aspects. The claims do not, in contrast to the claims in the cited cases, simply describe the end result of improved targeting or more relevant content, but rather claim a specific system for providing that end result—a specific and concrete means for achieving the described improvements over prior art systems. *See TecSec Inc. v. Adobe Inc.*, 978 F.3d 1278, 1293 (Fed. Cir. 2020) ("We have found claims directed to such eligible matter in a number of cases where we have made two inquiries of significance here: whether the focus of the claimed advance is on a solution to 'a problem specifically arising in the realm of computer networks' or computers ... and whether the claim is properly characterized as identifying a 'specific' improvement in computer capabilities or network functionality, rather than only claiming a desirable result or function") (quoting *DDR Holdings*, 773 F.3d 1245; *Uniloc v. LG Elecs. USA, Inc.*, 957 F.3d 1306 (Fed. Cir. 2020)).

[3] The district court cited *Free Stream Media Corp. v. Alphonso Inc.*, 996 F.3d 1355 (Fed. Cir. 2021); *In re Morsa*, 809 F. App'x 913 (Fed. Cir. 2020); *Customedia Techs., LLC v. Dish Network Corp.*, 951 F.3d 1359 (Fed. Cir. 2020); *Bridge & Post, Inc. v. Verizon Commc'ns, Inc.*, 778 F. App'x 882 (Fed. Cir. 2019); *Brit. Telecomms. PLC v. IAC/InterActiveCorp*, 813 F. App'x 584, 587 (Fed. Cir. 2020).

Google's arguments in the district court that the '806 patent is abstract depended on significantly oversimplifying the patent and in so doing, erasing limitations present in the claims—in direct derogation of this Court's cautionary directives. *See, e.g.*, *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1313 (Fed. Cir. 2016) ("We have previously cautioned that courts 'must be careful to avoid oversimplifying the claims' by looking at them generally and failing to account for the specific requirements of the claims.") (quoting *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607 (Fed. Cir. 2016)).

For instance, claim 3 does not claim just ***any*** set of components for delivering targeted electronic content to a subscriber. Rather, it claims a ***specific*** arrangement of components for doing so, including particularly a deep packet inspection module that is operatively coupled to the behavioral information collector and operable to monitor the access communication traffic. Appx71 at 6:44-47. This is a way of assessing different types of communication traffic, which are passed over an access communication link, and examining that data below the level of the packet header in order to pinpoint the specific data that are important and merit attention. This makes the evaluation of the communication traffic by the system claimed in Claim 3 both more comprehensive in that it evaluates across communication types, and also more specific because it targets that information that is important for assessing what targeted electronic content should be delivered to the subscriber.

In *DDR Holdings*, this Court considered claims that addressed the internet-specific problem of users automatically leaving a website when clicking on an advertisement. *See* 773 F.3d at 1257-58. The claims at issue there called for an "outsource provider" along with other steps. *Id.* This Court's reasoning in finding the claims patent-eligible under Section 101 focused on the fact that the claims did not merely recite performing a pre-internet business practice on a computer or the internet. Instead, the claims described a specific solution that is "necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." *Id.* at 1257. Although the claimed solution was not "technologically complex" (*id.* at 1259), it also was not merely applying an abstract idea in a computer or internet context. The steps of the claimed method superseded and overrode the normal sequence of events when using websites, and so was not simply a conventional use of the internet. *Id.* at 1258.

Like the asserted patent in *DDR Holdings*, the '806 patent claims a behavioral information collector that is framed in functional language—as with the "outsource provider"—but that nonetheless overcomes a problem rooted in computer technology, namely the inaccurate sampling of data for use in determining what targeted electronic content the user will see. As in *DDR Holdings*, the '806 patent's claimed solutions to these problems are "necessarily rooted in computer technology," and are

not abstract or simply reflective of a use of conventional components in conventional ways.

The ’806 patent identifies specific technological problems in prior art systems for delivering targeted content to users based on information regarding their activities—namely, the limited ability to scan multiple sources of information and types of traffic and the excessive use of memory and processing resources, for example due to over-reliance on the use of cookies. These problems reflect technological limitations in prior art techniques that could not provide broader coverage of traffic types and types of user activities and depended on cookies with their inherent limitations. The patent describes and claims specific, technological solutions to these problems, implemented by way of a specific arrangement of physical components. The fact that the physical components may not have been new does not mean that using them in a particular configuration to address a particular problem is abstract. Just as a technological improvement to a security system, electronic spreadsheets, or system for detecting persistent errors is non-abstract, whether or not it uses existing components, so too an improvement to a system for delivering targeted content satisfies *Alice* step one.

Google’s reliance below on *Affinity Labs of Texas, LLC v. Amazon.com Inc.*, and *Customedia Technologies, LLC v. Dish Network Corp.*, was misplaced. In those cases, this Court noted on more than one occasion the asserted patent’s failure to

provide a solution to ***any*** technological problem, and treated that as a marker of abstractness. *Affinity Labs of Tex., LLC*, 838 F.3d 1266, 1269, 1272 (Fed. Cir. 2016); *Customedia Techs., LLC*, 951 F.3d 1359, 1363 (Fed. Cir. 2020). Here, however, the ’806 patent provides a solution to a specific technological problem.

This Court has repeatedly held in cases such as *SRI International, Inc. v. Cisco Systems, Inc.*, that claims that were directed to problems in the operation of computer-based or computer-related systems can pass muster under *Alice* step one. 930 F.3d 1295, 1303 (Fed. Cir. 2019) (noting that Cisco had overgeneralized the asserted patent and that "[i]nstead, the claims are directed to an improvement in computer network technology."). Similarly, this Court's decisions in *Koninklijke KPN N.V. v. Gemalto M2M GmbH*, 942 F.3d 1143, 1151 (Fed. Cir. 2019) and *Ancora Technologies, Inc. v. HTC America, Inc.*, 908 F.3d 1343, 1347-49 (Fed. Cir. 2018), make clear that claims can be directed to improvements in computer functionality without necessarily affecting the hardware components of a computer system at all. All three cases involved systems for monitoring specific types of data and analyzing that data to detect systematic errors (*Koninklijke*) or improve security (*SRI Int'l*, *Ancora Techs.*). *See also Data Engine Techs. LLC v. Google LLC*, 906 F.3d 999 (Fed. Cir. 2018) (improvement in spreadsheet functionality). Thus, applying this reasoning to the analogous ’806 patent, the patent is not abstract and so passes muster under *Alice* step one.

### III. *Alice* Step Two: Claims 1 and 3 of the '806 Patent Recite an Inventive Concept

Claims 1 and 3 recite ordered combinations of elements sufficient to "transform the nature of the claim[s] into a patent-eligible application." *Alice*, 573 U.S. at 217. Specifically, these claims recite at least two ordered combinations that were not "well-understood, routine, and conventional to a skilled artisan at the time of the patent." *Berkheimer v. HP, Inc.*, 881 F.3d 1360, 1369 (Fed. Cir. 2018). Claim 1 provides an unconventional arrangement of a behavioral information collector in an access network remote from the subscriber. Appx7359 at ¶ 110. This arrangement of elements was not well-understood, routine, or conventional and thus recites an inventive concept. *See BASCOM*, 827 F.3d at 1350 ("an inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces.").

In addition to the unconventional arrangement that it inherits from claim 1, claim 3 further provides an inventive combination of elements, including the deployment of DPI alongside IPTV and the behavioral information collector and behavioral analyzer elements. This combination likewise was not well-understood, routine, and conventional and thus also provides an inventive concept. Appx7358-7359 at ¶¶ 109-10; *Amdocs (Isr.) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1301 (Fed. Cir. 2016) ("when all limitations are considered individually and as an ordered combination, they provide an inventive concept through the use of distributed architecture.").

For both ordered combinations, Brazos came forward with intrinsic evidence and expert testimony showing they were not well-understood, routine, or conventional. Appx7358-7359 at ¶¶ 109-10. Google had no evidence to the contrary— i.e., no evidence that the arrangement of the behavioral information collector external to the subscriber and the combination of DPI with IPTV ***were*** indeed well-understood, routine, and conventional—and instead argued the elements were ***individually*** conventional. *E.g.*, Appx7409-7410 at ¶ 114 (opining "no component disclosed in the claims is unconventional."), Appx7410-7414 at ¶¶ 117-128 (opining that DPI, individually, "is a conventional technique"). Put simply, there is no evidence in the record suggesting that either of these ***combinations*** was well-understood, routine, and conventional. Google thus could not possibly meet its summary judgment burden to prove no material disputes of fact under the clear and convincing evidentiary standard. *Berkheimer*, 881 F.3d at 1368 (holding that whether something was well-understood, routine, and conventional "must be proven by clear and convincing evidence.") (citing *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 95 (2011)).

The district court erred in granting Google's summary judgment motion despite the existence of factual disputes as to whether the ordered combinations were well-understood, routine, and conventional. *Cf. Berkheimer*, 881 F.3d at 1369 ("Whether something is well-understood, routine, and conventional to a skilled artisan at the time of the patent is a factual determination."). In *Berkheimer*, as here,

factual assertions in the specification "contradicted the district court's finding that the claims describe well-understood, routine, and conventional activities." *Id.* at 1368. This Court reversed, finding that "[w]hether claims 4-7 perform well-understood, routine, and conventional activities to a skilled artisan is a genuine issue of material fact making summary judgment inappropriate with respect to these claims." *Id.* at 1370. Similarly, this Court should reverse and remand to allow the factual issues to be resolved by a jury.

### A. The District Court Erred by Finding No Fact Issue as to Whether the Arrangement of the "Behavioral Information Collector" Provides an Inventive Concept

The arrangement of the behavioral information collector in an access network external to the subscriber device was not well-understood, routine, or conventional and thus supplied an inventive concept. *See BASCOM*, 827 F.3d at 1345 ("The inventive concept described and claimed in the '606 patent is the installation of a filtering tool at a ***specific location, remote*** from the end-users") (emphasis added). Brazos cited both intrinsic evidence and expert testimony attesting to this fact. *See infra*; *see also Berkheimer*, 881 F.3d at 1368. Despite bearing a clear and convincing burden to demonstrate otherwise, Google cited no affirmative evidence to the contrary—i.e., that the specific arrangement was indeed well-understood, routine, and conventional. The district court thus erred in finding Google met this burden.

First, Brazos cited factual assertions from the specification affirming that this arrangement was not well-understood, routine, or conventional, alone sufficient to defeat summary judgment. *See Berkheimer*, 881 F.3d at 1370 ("summary judgment was improper, given the fact questions created by the specification's disclosure."); *PPS Data, LLC v. Jack Henry & Assocs.*, 404 F. Supp. 3d 1021, 1040 (E.D. Tex. 2019) (collecting cases) ("Factual assertions in the specification addressed to inventiveness are competent summary judgment evidence[] and, alone, preclude summary judgment.").

To start, the specification disparages conventional subscriber profiling techniques requiring processes internal to the subscriber device such as cookies: "Traditional behavioral ad networks that rely on cookies being accepted and deposited in a subscriber's computer are vulnerable to subscribers disabling of cookies, thus removing the ad network's ability to track subscriber behavior." Appx76 at 15:20-23. The specification then asserts that the disclosed, unconventional techniques are not internal to the subscriber: "[t]he techniques disclosed herein do not depend on any special hardware, firmware, or software arrangements, including cookies, on the subscriber's computer." *Id.* at 15:23-26. This factual assertion was sufficient to show that the arrangement of the behavioral information collector external to the subscriber so as to not depend on it, demonstrated the unconventional nature of the arrangement.

Second, unrebutted expert testimony confirmed that the arrangement was not well-understood, routine, or conventional. Dr. Mangione-Smith opined that "claim 3 recites an unconventional arrangement of elements with the behavioral information collector and DPI module being remote from the user device." Appx7359 at ¶ 110. Dr. Mangione-Smith further opined that "[t]his unconventional arrangement enables improved communication traffic sampling and lessens computational resource usage … at the user device." *Id.* Dr. Mangione-Smith concluded that "[t]his recited location of the … behavioral information collector was not routine, conventional, or well-understood in the field of the invention." *Id.* Google's expert Dr. Houh offered no opinion to the contrary—i.e., no opinion that the arrangement of the behavioral information collector external to the subscriber device ***was*** well-understood, routine, and conventional. *See generally* Appx7406-7417. In fact, Dr. Houh never addressed this inventive arrangement at all (*see id.*), much less proffered clear and convincing evidence of its conventionality.

This Court's decision in *Cooperative Entertainment, Inc. v. Kollective Technology, Inc.*, 50 F.4th 127 (Fed. Cir. 2022), is illustrative. This Court reversed a district court's dismissal of plaintiff's amended complaint, in which the district court had held that patent claims directed to "systems and methods of structuring a peer-to-peer (P2P) dynamic network for distributing large files" were patent-ineligible under Section 101. *Id.* at 129. This Court explained that the patentee plausibly pled

at least two inventive concepts that should have precluded the district court's finding of patent ineligibility. One of the inventive concepts was "a particular arrangement of peer nodes for distributing content outside controlled networks and/or [CDNs], which did not exist in the prior art." *Id.* at 133. "[By] by-passing any established or static content delivery network (CDN) ... this saves time, improves redundancy, and also reduces or eliminates costs for content delivery over the CDN for the peer nodes." *Id.* at 135 (citation omitted). The other inventive concept was the claims' recitation of the additional element of using trace routes to segment content, which provided "increased reliability, more redundancy, and more efficient delivery than those of the prior art." *Id.* (citation omitted). Importantly, this Court noted that "useful improvements to computer networks are patentable regardless of whether the network is comprised of standard computing equipment." *Id.*

The district court's finding of no inventive concept at *Alice* step two should be reversed.

### B. The District Court Erred by Failing to Apply the Plain and Ordinary Meaning of "Behavioral Information Collector" Before Finding No Inventive Concept

Notably, the district court ***did not disagree with Brazos*** that the arrangement of the behavioral information collector external to the subscriber could provide an inventive concept. Appx25-28. Instead, the district court granted summary judgment because it found such arrangement was not expressly required: "nothing in the

language of Claim 3 requires a location remote from the subscriber." Appx26-27. But the plain and ordinary meaning of "a behavioral information collector" as the term is used in the patent requires its being external to the subscriber. The district court's erroneous claim interpretation that the behavioral information collector need not be remote from the subscriber should be reversed. Because this was the only reason the district court cited in disqualifying the '806 patent's inventive arrangement, the court's finding of no inventive concept should also be reversed. In the alternative, this Court should remand for further claim construction proceedings at least as to the location of the behavioral information collector.

At the *Markman* stage, the district court held that all terms, including elements in the inventive arrangement, are to be given their plain and ordinary meanings. Appx623 (holding that all disputed terms, including "behavioral information collector," "communication traffic exchanged with a communication network subscriber over an access communication link," and "access network" are to be given their plain and ordinary meanings). The plain and ordinary meaning of the behavioral information collector requires a location external to the subscriber device.

First, the claim language itself precludes the claimed system from being internal to the subscriber device. Claim 1 requires a system component—a behavioral information collector—that must be external to the subscriber. The behavioral information collector is required to "monitor communication traffic exchanged with a

communication network subscriber over an ***access communication link***." This can only occur external to the subscriber. Communication traffic is necessarily external to the subscriber since it must be ***exchanged*** with the subscriber. Moreover, such communication traffic is exchanged over an ***access communication link***, which sits in between the subscriber and an access network. *See* Appx67 at Figure 2 (showing access communication link 16 situated between subscriber 22 and access network 24). Indeed, Google's proposed construction of this phrase—"the digital information traversing a network link ***between a communication network subscriber*** and an access network" (Appx504 (emphasis added))—confirms that the behavioral information collector must be external to the subscriber, i.e., ***between*** the subscriber and an access network. The behavioral information collector's monitoring must therefore occur external to the subscriber. Indeed, if the behavioral information collector were internal to the subscriber, there would be no need to monitor communication traffic to obtain behavioral information of the subscriber. Accordingly, by the language of the claim, the plain and ordinary meaning of "behavioral information collector" requires a location external to the subscriber.

Second, the specification precludes the behavioral information collector from being internal to the subscriber. The specification provides that "[s]ubscriber systems ***do not require any modifications*** to support behavior tracking" (Appx72 at 8:36-38 (emphasis added))—i.e., inclusion of the "behavioral information

collector." The district court's claim interpretation that permits inclusion of the behavioral information collector ***within*** the "subscriber system" thus contradicts the specification.

The specification also only describes the inventive system as being external to the subscriber. For example, the Background of the '806 patent expresses disadvantages to behavior tracking techniques internal to the subscriber—e.g., the use of cookies. Appx69 at 1:47-67. In line with this, every inventive embodiment is disclosed to be external to the subscriber. The specification states that "the techniques disclosed herein are implemented in an ***access network*** such as 16." Appx71 at 5:30-32. Again, access network 16 is ***external*** to the subscriber device:




**FIG. 1**

Appx66 at FIG. 1.

Figure 2 likewise requires the "Behavioral Information Collector [28/32/34]" ***external*** to "Subscriber 22":




**FIG. 2**

There is simply no disclosed embodiment in which the claimed system is internal to the subscriber. Accordingly, the behavioral information collector is located external to the subscriber by the claims' plain and ordinary meaning.

At the district court, Google advanced no evidence or argument contrary to this plain and ordinary meaning, only maintaining that claim 3 did not ***expressly require*** this arrangement. Appx7391 ("Claim 3 has no language, and plaintiff identifies none, requiring that the behavioral information collector or DPI module must be remote from the subscriber device."). But claims need not have express language

to inform what the plain and ordinary meaning encompasses. *Cf. Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (the plain and ordinary meaning of "a claim term is the meaning that the term would have to a person of ordinary skill."). A POSA would have understood that the behavioral information collector is located in the access network remote from the subscriber. Importantly, Google pointed to no claim language nor embodiments in the specification suggesting that the behavioral information collector could be internal to the subscriber. *See generally* Appx7389-7392; Appx8378-8384 at 9:11-15:11.

The district court erred by not applying this plain and ordinary meaning in finding no genuine issue of disputed fact that the arrangement of the behavioral information collector remote from the subscriber provides an inventive concept. The district court's only reason for rejecting the inventive arrangement was that "[n]othing in the language of Claim 3 requires a location remote from the subscriber." Appx26-27. This is contrary to the plain and ordinary meaning of behavioral information collector, which does require such location. As above, the claim language itself, along with the intrinsic evidence, dictate this understanding. The district court's interpretation of the claim as not "requir[ing] a location remote from the subscriber," and the finding of no inventive concept that necessarily flowed from it, should be reversed.

### C. The District Court Erred In Finding No Fact Issue as to Whether the Combination of DPI and IPTV Provides an Inventive Concept

Brazos's evidence further created at least a fact issue that the combination of DPI and IPTV in claim 3 was not well-understood, routine, and conventional, sufficient to defeat summary judgment. Google, on the other hand, presented no evidence that this combination of elements existed as of the priority date, let alone clear and convincing evidence that it was sufficiently well-understood, routine, and conventional so as to fail *Alice* step two. Summary judgment was thus inappropriate because Google had not shown that "there is no genuine issue of material fact regarding whether the ... claimed combination is well-understood, routine, conventional." *Berkheimer*, 881 F.3d at 1368. The district court erred by failing to consider this combination of elements in its step two analysis before finding no inventive concept.

In the summary judgment proceedings, Brazos cited unrebutted expert testimony that combining DPI with other claim elements was "not routine, convention[al], or well-understood in the field of the invention." Appx7358-7359 at ¶ 109. Dr. Mangione-Smith further opined that "prior targeted electronic content delivery systems deposited cookies onto user devices and did not use … DPI modules to build behavioral profiles." *Id.* Google's expert Dr. Houh, on the other hand, again had no competing opinion. Appx7406-7417 at ¶¶ 106-35. The record evidence was more than sufficient to create a fact dispute over whether the combination of DPI and

IPTV recited an inventive concept by being more than that which is well-understood, routine, and conventional. The district court erred in not allowing this fact issue to go to a jury.

## CONCLUSION AND STATEMENT OF RELIEF SOUGHT

The district court incorrectly determined both that the claims of the ’806 patent are directed to abstract subject matter under *Alice* step one, and that the claims fail to supply an inventive concept under *Alice* step two. In doing so, the court incorrectly applied the *Alice* analysis and clearly erred in making factual findings that the components of the claimed system were routine, conventional, and well-known and arranged in a conventional manner. As detailed above, the ’806 patent is directed to non-abstract subject matter, and the court failed to interpret the claims correctly to limit them to the unconventional arrangement of components that supplies the inventive concept.

This Court should therefore reverse the district court’s finding of patent ineligibility for the claims of the ’806 patent or, in the alternative, remand for further claim construction proceedings.

Dated: November 13, 2025

Respectfully submitted,

*/s/ Joseph M. Abraham*

Joseph M. Abraham
joseph.abraham@foliolaw.com
Timothy Dewberry
timothy.dewberry@foliolaw.com
FOLIO LAW GROUP PLLC
13492 Research Blvd.
Ste. 120, No. 177
Austin, TX 78750
(737) 234-0201

Alexandra Fellowes
alexandra.fellowes@foliolaw.com
Moses Xie
moses.xie@foliolaw.com
FOLIO LAW GROUP PLLC
1200 Westlake Ave. N., Ste. 809
Seattle, WA 98109
(206) 880-1802

*Counsel for Appellant*

# ADDENDUM

# TABLE OF CONTENTS

**Page:**

**Pretrial Conference Order filed November 28, 2023 .......... Appx1**

**Excerpted Oral Order from Transcript of Markman and Motions Hearing on February 16, 2023 .......... Appx4**

**Memorandum Opinion and Order filed June 12, 2025 .......... Appx8**

**Final Judgement filed June 12, 2025 .......... Appx29**

**U.S. Patent No. 8,041,806 .......... Appx64**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | |
|---|---|
| WSOU INVESTMENTS, LLC d/b/a BRAZOS LICENSING & DEVELOPMENT,<br><br>*Plaintiff*,<br><br>v.<br><br>GOOGLE LLC,<br><br>*Defendant*. | Case No. 6:20-cv-00572-ADA<br><br>Case No. 6:20-cv-00584-ADA<br><br>**JURY TRIAL DEMANDED** |

**PRETRIAL CONFERENCE ORDER**

On November 13, 2023, the Court held a Pretrial Conference in the above-captioned matters. The Court's rulings are stated on the record at the hearing and as detailed below.

| Case | Motion and ECF No. | Ruling |
|---|---|---|
| 572 | Brazos's Motion for Summary Judgment Concerning Google's Affirmative Defenses (ECF No. 158) | Denied as moot. |
| 584 | Brazos's Motion for Summary Judgment Concerning Google's Affirmative Defenses (ECF No. 158) | Denied as moot. |
| 572 | Brazos's *Daubert* Motion to Exclude Certain Damages Opinions in the Expert Report of W. Christopher Bakewell, or in the Alternative Strike Portions of the Expert Report of W. Christopher Bakewell (ECF No. 166) | Denied. |
| 584 | Brazos's *Daubert* Motion to Exclude Certain Damages Opinions in the Expert Report of W. Christopher Bakewell, or in the Alternative Strike Portions of the Expert Report of W. Christopher Bakewell (ECF No. 165) | Denied. |

| Case | Motion and ECF No. | Ruling |
|---|---|---|
| 572 | Google's Motion to Exclude Certain Opinions of Technical Expert William Mangione-Smith (ECF No. 160) | Denied. |
| 584 | Google's Motion to Partially Dismiss WSOU's First Amended Complaint (ECF No. 113) | Denied. |
| 572 | Google's Motion for Reconsideration of Summary Judgment That Claim 3 is Patent Ineligible Under Section 101 (ECF No. 161) | Granted. |
| 572 | Brazos's *Daubert* Motion to Exclude Claim Construction and Single-Reference Obviousness Opinions of Dr. Henry Houh (ECF No. 156) | Denied as moot. |
| 572 | Google's Motion for Summary Judgment of Non-Infringement (ECF No. 163) | Denied as moot. |
| 572 | Google's Motion to Exclude Testimony of WSOU's Damages Expert Mr. Chase Perry (ECF No. 165) | Denied as moot. |
| 584 | Google's Motion for Summary Judgment of Non-Infringement and Partial Summary Judgment of Invalidity (ECF No. 162) | Granted in part and hold that: (1) the Nest Thermostat cannot infringe Claim 1 as a matter of law because it is not a "mobile communication device" that uses radar to detect movement; and (2) Brazos has not raised a triable issue regarding willful infringement.<br><br>Denied as to all other remaining grounds. |
| 584 | Brazos's *Daubert* Motion to Exclude Claim Construction Opinions of Dr. Benjamin Bederson (ECF No. 156) | Granted. |
| 584 | Google's Motion to Exclude Testimony of WSOU's Damages Expert Mr. Chase Perry (ECF No. 164) | Granted in part with respect to Mr. Perry's "profit split" opinion.<br><br>Moot as to all other remaining grounds. |

| Case | Motion and ECF No. | Ruling |
|---|---|---|
| 584 | Google's Motion to Exclude Certain Opinions of Technical Expert Jeremy Cooperstock (ECF No. 160) | Granted in part and hold that Dr. Cooperstock's opinions about the source of overlapping disclosures between the anticipatory patent and the asserted patent are excluded, and paragraphs 73 and 74 of his report are stricken.<br><br>Denied as to all other remaining grounds. |
| 572 & 584 | Google's Motions in Limine (572 ECF No. 196; 584 ECF No. 192) | Denied as moot. |

IT IS SO ORDERED.

SIGNED: 11/28/2023

HON. ALAN D. ALBRIGHT
UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

WSOU INVESTMENTS LLC *
* February 16, 2023
VS. *
* CIVIL ACTION NOS.
GOOGLE LLC * W-20-CV-572/580/584/585

BEFORE THE HONORABLE ALAN D ALBRIGHT
MOTION and MARKMAN HEARING (via Zoom)

APPEARANCES:

For the Plaintiff: Joseph M. Abraham, Esq.
Folio Law Group PLLC
13492 Research Blvd, Ste. 120, #177
Austin, TX 78750

Moses Xie, Esq.
Folio Law Group PLLC
1200 Westlake Ave. N., Ste. 809
Seattle, WA 98109

For the Defendant: Tharan Gregory Lanier, Esq.
Jones Day
1755 Embarcadero Road
Palo Alto, CA 94303

Edwin O. Garcia, Esq.
Tracy A. Stitt, Esq.
Jones Day
51 Louisiana Avenue, N.W.
Washington, DC 20001

Jennifer A. Kash, Esq.
Warren Lex LLP
2261 Market Street, No. 606
San Francisco, CA 94114

Israel Sasha Mayergoyz, Esq.
Jones Day
77 West Wacker, Suite 3500
Chicago, IL 60601

particular arrangement. Claim 1 is not simply that any component can be in any order. It requires the arrangement of specific components that are coupled to each other in order to accomplish the goal of assessing the communication traffic and, on that basis, delivering targeted electronic content with the subscriber-selected electronic content.

So I simply disagree. I think it's attorney argument to say that anything that I pull from the specification regarding any other embodiment can be imported into Claim 1 and also Claim 3.

That's all I have, Your Honor.

THE COURT: Mr. Lanier, anything else?

MR. LANIER: No, Your Honor.

THE COURT: I'll be back in a few seconds.

(Pause in proceedings.)

THE COURT: Okay. I'm going to go back on the record.

And I just want to make sure my understanding is correct that -- and I'll start with Mr. Lanier.

Google is moving for summary judgment with respect to Section 101 on all of the claims that Google is still -- I don't remember the exact numbers.

It was -- I think there were four of them, 3 -- Claim 3 and some others.

And your motion is for summary judgment on all the claims that are -- that Google's still arguing over essentially, correct?

MR. LANIER: That's correct, Your Honor.

THE COURT: Okay. I'm going to grant that motion with the exception of Claim 3.

With regard to Claim 3, I'm going to deny both motions, Google's motion and plaintiff's -- I'm sorry. Yes. Plaintiff's cross-motion -- or I don't know if it's cross. I guess it is. Y'all filed first.

But I'm denying it with respect to Claim 3, and we'll take up that issue at trial with respect to the second question.

Now, that means we have a Markman to do, which always excites me. And so I look very much forward to hearing especially -- no offense to anyone, but I look forward to hearing the young person who's going to get to argue. That always -- I think it's one of the great things I get to do.

The claim term is "Internet Protocol Television (IPTV) service." And I'll hear first from the defendant.

MR. LANIER: Thank you, Your Honor.

UNITED STATES DISTRICT COURT )
WESTERN DISTRICT OF TEXAS )

I, Kristie M. Davis, Official Court Reporter for the United States District Court, Western District of Texas, do certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

I certify that the transcript fees and format comply with those prescribed by the Court and Judicial Conference of the United States.

Certified to by me this 17th day of February 2023.

*/s/ Kristie M. Davis*
KRISTIE M. DAVIS
Official Court Reporter
800 Franklin Avenue
Waco, Texas 76701
(254) 340-6114
kmdaviscsr@yahoo.com

10:43

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | | |
|---|---|---|
| **WSOU INVESTMENTS LLC,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL NO. W-20-CV-00572-ADA** |
| | § | |
| **GOOGLE LLC,** | § | |
| | § | |
| **Defendant.** | § | |
| | § | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is Defendant Google LLC's ("Google") Motion for Summary Judgment of Patent Ineligibility Under 35 U.S.C. § 101 (ECF No. 48), Plaintiff WSOU Investments LLC's (d/b/a Brazos Licensing and Development, "Brazos") Motion for Summary Judgment of No Invalidity Under 35 U.S.C. § 101 (ECF No. 118), and Google's Motion for Reconsideration of Summary Judgment (ECF No. 161). The Court heard the parties' arguments as to the cross-motions for summary judgment on February 16, 2023, and orally granted-in-part Google's motion and denied Brazos' motion. ECF No. 144. After the parties briefed Google's motion for reconsideration, the Court heard the parties' arguments on November 13, 2023. ECF No. 247. During that hearing, the Court orally granted Google's motion. *Id.* This opinion memorializes and explains the Court's rulings.

## I. BACKGROUND

Plaintiff Brazos filed this suit against Defendant Google, alleging infringement of U.S. Patent No. 8,041,806 (the "'806 Patent" or "Asserted Patent"). ECF No. 1. On August 27, 2021, Google filed its Motion for Summary Judgment of Patent Ineligibility Under 35 U.S.C. § 101. ECF No 48. Google's motion for summary judgment and the subsequent briefing focus on Claims 1–

14 of the '806 Patent, which were the asserted claims at the time of briefing. *See id.*; ECF Nos. 50, 55. On July 27, 2022, Brazos filed its Motion for Summary Judgment of No Invalidity Under 35 U.S.C. § 101, which was subsequently briefed[1] by the parties. ECF Nos. 118, 127, 129. By the time of Brazos' cross-motion, Brazos had narrowed its asserted claims to Claims 2, 3, 5, and 7, all of which depend from Claim 1. *See* ECF No. 118 at 1 n.1. Brazos' motion for summary judgment is limited to Claim 3. *See id.* at 5; ECF No. 129 at 9–10.

On February 16, 2023, the Court heard oral arguments on the cross-motions for summary judgment, during which the Court granted Google's motion as to Claims 1, 2, 5, and 7, finding these claims patent ineligible. ECF No. 144 at 41:7–15. The Court denied Google's and Brazos' motions as to Claim 3, determining that step two of the ineligibility inquiry should proceed to trial. *Id.* at 41:13–15.

On June 28, 2023, Google filed a motion for reconsideration of the Court's denial of its motion for summary judgment as to Claim 3, which was subsequently briefed by the parties. ECF Nos. 161, 179, 201. Google argued that the record had been fully developed since the Court's previous ruling on its motion for summary judgment, and that the fully developed record demonstrated that there is no genuine issue of material fact that Claim 3 is invalid under § 101. *Id.* at 1. On November 13, 2023, the Court heard oral arguments on the matter during the pretrial conference and granted Google's motion. ECF No. 247 at 17:6–7; *see also* ECF No. 245 at 2.

## II. LEGAL STANDARD

### A. Summary Judgment Standard

"Summary judgment must be granted when, drawing all reasonable inferences in favor of the non-movant, there is no genuine issue as to any material fact." *Billups-Rothenberg, Inc. v.*

[1] Brazos further filed a Notice of Supplemental Authority in support of its motion for summary judgment, to which Google responded. ECF Nos. 131, 132.

*Associated Reg'l & Univ. Pathologists, Inc.*, 642 F.3d 1031, 1036 (Fed. Cir. 2011); Fed. R. Civ. P. 56(a). "Under 35 U.S.C. § 282, a patent is presumed valid and one challenging its validity bears the burden of proving invalidity by clear and convincing evidence." *Innovative Scuba Concepts, Inc. v. Feder Indus., Inc.*, 26 F.3d 1112, 1115 (Fed. Cir. 1994). When the "'clear and convincing' evidence requirement applies, the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *see also Eli Lilly & Co. v. Barr Lab'ys, Inc.*, 251 F.3d 955, 962 (Fed. Cir. 2001) ("[A] moving party seeking to invalidate a patent at summary judgment must submit such clear and convincing evidence of invalidity so that no reasonable jury could find otherwise."). In determining whether a genuine issue of material fact exists, the court views the evidence in the light most favorable to the nonmoving party and resolves all doubts in its favor. *Eli Lilly & Co.*, 251 F.3d at 962. The same standard applies when considering cross-motions for summary judgment.

**B. Rule 54(b) Motion for Reconsideration**

Federal Rule of Civil Procedure 54(b) "allows parties to seek reconsideration of interlocutory orders and authorizes the district court to 'revise at any time' 'any order or other decision . . . that does not end the action.'" *Austin v. Kroger Texas, L.P.*, 864 F.3d 326, 336 (5th Cir. 2017). "Under Rule 54(b), the trial court is free to reconsider and reverse its decision for any reason it deems sufficient, even in the absence of new evidence or an intervening change in or clarification of the substantive law." *Id.* at 336.

### C. Patent Eligibility Under 35 U.S.C. § 101

Section 101 of the Patent Act defines the subject matter eligible for patent protection: "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." 35 U.S.C. § 101. However, courts have long recognized that laws of nature, natural phenomena, and abstract ideas are not patentable under § 101 because they are "the basic tools of scientific and technological work." *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014) (citations omitted).

In *Alice*, the Supreme Court articulated a two-step framework for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts. *Id.* at 217. In *Alice* step one, the court must "determine whether the claims at issue are directed to one of those patent-ineligible concepts." *Id.* In doing so, the court must be careful not to over generalize the invention because "all inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Id.* (quoting *Mayo Collaborative Servs. v. Prometheus Lab'ys, Inc*, 566 U.S. 66, 71 (2012)). Instead, "the claims are considered in their entirety to ascertain whether their character as a whole is directed to excluded subject matter." *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1312 (Fed. Cir. 2016) (citation omitted). If the claims are not directed to one of those patent-ineligible concepts, the inquiry ends. If the claims are directed to one of those patent-ineligible concepts, then the inquiry proceeds to step two of the *Alice* framework.

In *Alice* step two, the court considers whether the claims contain an "inventive concept" sufficient to "transform the nature of the claim into a patent-eligible application." *Alice*, 573 U.S. at 217–18 (quotation omitted). In doing so, the court considers "the elements of each claim both individually and 'as an ordered combination'" to determine whether they are "'sufficient to ensure

that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Id.* (quoting *Mayo*, 566 U.S. at 72–73). *Alice* step two is satisfied when the claim limitations "involve more than performance of 'well-understood, routine, [and] conventional activities previously known to the industry.'" *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1367 (Fed. Cir. 2018) (quoting *Alice*, 573 U.S. at 225 and *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1347–48 (Fed. Cir. 2014)). However, to recite an inventive concept, a patent must do more than recite an abstract idea "while adding the words 'apply it.'" *Alice*, 573 U.S. at 221 (quoting *Mayo*, 566 U.S. at 72). "[S]imply appending conventional steps, specified at a high level of generality, to laws of nature, natural phenomena, and abstract ideas cannot make those laws, phenomena, and ideas patentable." *Mayo*, 566 U.S. at 82. Likewise, "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Alice*, 573 U.S. at 223.

"While the ultimate determination of eligibility under § 101 is a question of law, like many legal questions, there can be subsidiary fact questions which must be resolved en route to the ultimate legal determination." *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1128 (Fed. Cir. 2018). As such, "[t]he question of whether a claim element or combination of elements is well-understood, routine and conventional to a skilled artisan in the relevant field is a question of fact" that must be "proven by clear and convincing evidence." *Berkheimer*, 881 F.3d at 1368. Additionally, specific improvements described in a patent specification, "to the extent they are captured in the claims, [may] create a factual dispute regarding whether the invention describes well-understood, routine, and conventional activities." *Id.* at 1369. However, "[w]hen there is no genuine issue of material fact regarding whether the claim element or claimed

combination is well-understood, routine, conventional to a skilled artisan in the relevant field, [patent eligibility] can be decided on summary judgment as a matter of law." *Id.* at 1368.

## III. DISCUSSION

For the reasons set forth below, the Court finds that Claims 1, 2, 3, 5, and 7 are directed to the abstract idea of delivering targeted content. The Court further finds, based on the fully developed record, that there are no genuine disputes over the underlying facts material to the § 101 inquiry. Thus, summary judgment is appropriate in Google's favor as to Claims 1, 2, 3, 5, and 7.

### A. The '806 Patent

The '806 Patent is entitled "Targeted Electronic Content Delivery Control Systems and Methods" and "relates generally to communications and, in particular, to control of electronic content delivery to subscribers in communication networks based on subscriber behaviors." '806 Patent[2] at 1:7–10. The '806 Patent explains that existing advertising distribution techniques suffer from flaws that result in an "advertising spend wastage problem" and recognizes "a need for improved targeted electronic content delivery control techniques." *Id.* at 1:14–2:33 . Thus, the '806 Patent aims to "significantly improve an advertiser's return on investment of its advertising expenditures by delivering highly relevant targeted online advertisements and/or other electronic content to end consumers using continuous and thorough analysis of the consumers' online behaviors." *Id.* at 2:37–42.

Accordingly, the '806 Patent discloses a communication system including subscriber systems, an access communication network, and a core communication network. *Id.* at 4:46–50. Each subscriber system includes "a communication device [(*e.g.*, a personal computer)] through which a subscriber can exchange communication traffic with the access communication network

---

[2] The '806 Patent is filed at ECF No. 48-1.

[(*e.g.*, the internet service provider (ISP))]" and "access electronic content, services, and/or other functions supported in the access communication network or in the core communication network [(*e.g.*, the internet)]." *Id.* at 5:1–16.

The '806 Patent further discloses a communication system incorporating behavior-based electronic content delivery control, as illustrated in Figure 2 below. *Id.* at 4:36–38.




**FIG. 2**

As shown in Figure 2, behavioral information collectors are "deployed 'inline' in the access communication link 26 at the access side or network side of the SME [Subscriber Management Element] 30, as shown at 28 and 32, respectively" and/or in an "offline" position, as shown at 34. *Id.* at 5:36–53. The purpose of a behavioral information collector "is to monitor all communication traffic flows of the subscriber 22." *Id.* at 8:14–17. Online characterization definitions database 48 specifies the types of behavioral information that are to be included in behavioral analysis, and behavioral information collector management system 44 accesses these definitions and configures the behavioral information collectors accordingly. *Id.* at 8:41–49. Thus, "[t]hrough the behavioral information collector management system 44, a behavioral information collector could be configured to collect behavioral information from only certain types of traffic and/or to inspect

monitored traffic for specific data or particular fields," such as to identify visited URLs, search phrases and search result click-through, online web usage patterns, etc. *Id.* at 8:28–40.

The behavioral information collected by the behavioral information collectors is forwarded to behavioral analyzer 36, which formulates a view of the subscriber's behavior. *Id.* at 8:50–60. Behavioral analyzer 36 may create, maintain, and update new or existing behavioral profiles in behavioral profile database 46 to reflect ongoing subscriber behavior. *Id.* at 8:61–9:13. Such behavioral profiles are maintained in accordance with "behavior analysis definitions" that indicate "the types of traffic or information . . . to be used in maintaining subscriber behavioral profiles" and specify "the manner in which collected information is actually analyzed to generate and/or update behavior profiles." *Id.* at 9:14–32. For example, the type of information collected may be controlled by "online characterization definitions," such as URL, webpage context categorization, email traffic, search phrase monitoring, etc., and behavioral interest may be defined based on industry segments. *Id.* at 9:14–36.

To match targeted electronic content (e.g., advertisements) to subscribers that exhibit behaviors for which such content might be of interest, the '806 Patent further discloses "based on a subscriber's behavioral profile, subscriber behavioral tracking tags are forwarded to the electronic content delivery controller 56," which matches targeted electronic content to the subscriber's behavior. *Id.* at 9:64–10:10. For example, a visiting subscriber ID (e.g., the source IP address) may be sent by the electronic content source 58 (e.g., an electronic content publisher such as webpage) to the electronic content delivery controller 56. *Id.* at 7:39–43, 10:31–34. The electronic content delivery controller 56 may then obtain the visiting subscriber's behaviors from behavioral analyzer 36 or behavioral profile database 46 in the form of subscriber behavioral tracking tags. *Id.* at 10:34–38. Subscriber behavior is compared against targeted electronic content

stored in targeted content database 52, and relevant targeted electronic content is retrieved and forwarded to electronic content source 58 for delivery to subscriber 22. *Id.* at 10:38–48.

The asserted claims (Claims 2, 3, 5, and 7) all depend from Claim 1, which recites:

> 1. A system comprising:
>
> a behavioral information collector operable to monitor communication traffic exchanged with a communication network subscriber over an access communication link, the access communication link enabling the subscriber to access electronic content, the behavioral information collector being configurable to collect from any of a plurality of types of communication traffic in the monitored communication traffic behavioral information indicative of behavior of the subscriber in using the access communication link;
>
> a behavioral analyzer operatively coupled to the behavioral information collector and operable to maintain a behavioral profile of the subscriber that reflects ongoing behavior of the subscriber, based on behavioral information collected from only one or more particular types of the plurality of types of communication traffic in the monitored communication traffic, maintenance of the behavioral profile being unaffected by behavioral information collected from types of communication traffic other than the one or more particular types of communication traffic; and
>
> an electronic content delivery controller operatively coupled to the behavioral analyzer and operable to control, based on the behavioral profile, delivery of targeted electronic content to the subscriber for presentation with electronic content accessed by the subscriber,
>
> wherein at least one of the behavioral information collector, the behavioral analyzer, and the electronic content delivery controller is implemented using hardware,
>
> wherein the access communication link comprises a network link in an access network, the access network comprising an electronic content source that is operable to deliver the accessed electronic content to the subscriber,
>
> wherein the electronic content source provides an Internet Protocol Television (IPTV) service, and
>
> wherein the electronic content delivery controller is further operable to select the targeted electronic content from targeted electronic content provided by multiple targeted electronic content providers.

*Id.* at 16:2–42.

### B. *Alice* Step One

Though WSOU no longer asserts Claim 1, the Court first addresses this claim to properly analyze Asserted Claims 2, 3, 5, and 7, which all depend from Claim 1. After careful consideration, the Court finds that Claim 1 and the asserted claims are directed to the abstract idea of delivering targeted content.

#### 1. Claims directed to delivery of targeted content are abstract

The Federal Circuit has repeatedly found claims directed to presenting users with targeted content as being directed to abstract ideas. *See, e.g.*, *Free Stream Media Corp. v. Alphonso Inc.*, 996 F.3d 1355, 1361–65 (invalidating claims "directed to the abstract idea of targeted advertising"); *In re Morsa*, 809 F. App'x 913, 917 (Fed. Cir. 2020) (holding that claims directed to "targeted advertising" is an "abstract idea[] relating to customizing information based on the user and matching them to the advertiser"); *Customedia Techs., LLC v. Dish Network Corp.*, 951 F.3d 1359, 1362 (Fed. Cir. 2020) ("The claims at issue here are directed to the abstract idea of using a computer to deliver targeted advertising to a user."); *Bridge & Post, Inc. v. Verizon Commc'ns, Inc.*, 778 F. App'x 882, 888 (Fed. Cir. 2019) (finding that the claims were "directed to the abstract idea of implementing targeted marketing using a persistent identifier"); *Brit. Telecomms. PLC v. IAC/InterActiveCorp*, 813 F. App'x 584, 587 (Fed. Cir. 2020) ("We have previously held that tailoring the provision of information to a user's characteristics, such as location, is an abstract idea.").

#### 2. Claim 1 is directed to the delivery of targeted content and is therefore abstract

It is clear from the specification and the claim language that the claimed invention is directed to the abstract idea of delivering targeted content to a subscriber. The patent abstract states that "[t]argeted electronic content delivery control systems and methods are disclosed" and that

"[d]elivery of targeted electronic content to the subscriber for presentation with electronic content accessed by the subscriber is controlled based on the behavioral profile." '806 Patent at Abstract. Indeed, the entire specification confirms that the claimed invention is directed to the abstract idea of collecting behavioral information about a subscriber and delivering targeted content to the subscriber based on that information. *See supra* Part III(A).

While Claim 1 elaborates on the specifics of the invention, the limitations merely describe implementing the invention of targeted content delivery using generic computer functions. Specifically, Claim 1 recites: (a) "a behavioral information collector" that monitors and collects behavioral information about a subscriber; (b) "a behavioral analyzer" that analyzes that information and "maintain[s] a behavioral profile" of the subscriber; and (c) "an electronic content delivery controller" that controls delivery of targeted content "based on the behavioral profile" of the subscriber, where "the targeted electronic content" is selected from various sources. '806 Patent at 16:3–28, 39–42. As explained above, tailoring the provision of information to a user's characteristics is an abstract idea.

Claim 1 further recites that "at least one of the behavioral information collector, the behavioral analyzer, and the electronic content delivery controller is implemented using hardware." *Id.* at 16:29–31. However, the recitation of "[g]eneric and functional hardware is insufficient to render eligible claims directed to an abstract idea." *Customedia*, 951 F.3d at 1366. The additional requirement of an "electronic content source" that "provides an Internet Protocol Television (IPTV) service" only serves to limit the use of the abstract idea to a particular technological environment, which fails to render the claim patent eligible. *See buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014). Thus, the Court finds that Claim 1 is directed to the abstract idea of delivering targeted content.

**3. Dependent Claims 2, 3, 5, and 7 are likewise directed to the abstract idea of delivering targeted content**

The Court further finds that Claims 2, 3, 5, and 7, which depend from Claim 1, fail to recite anything that renders these claims non-abstract. While Google's motion for summary judgment addresses Claims 1, 2, 3, 5, and 7, Brazos' response primarily addresses the independent claims that were asserted at the time and vaguely alludes to the dependent claims. *See* ECF Nos. 48, 50. Brazos' cross-motion concerns only dependent Claim 3. ECF No. 118. Google's motion for reconsideration also addresses Claim 3. ECF No. 161. Accordingly, the Court addresses Claim 3 first, and then Claims 2, 5, and 7.

**i. Claim 3 is directed to an abstract idea**

Claim 3 provides that "the monitored communication traffic comprises packet traffic," and that the system further comprises "a Deep Packet Inspection (DPI) module operatively coupled to the behavioral information collector and operable to monitor the access communication traffic." '806 Patent at 16:47–52. Brazos argues that Claim 3's focus is "on concrete improvements to computer-related technology rather than on abstract ideas for which computers are merely invoked as a tool." ECF No. 118 at 9. Specifically, Brazos argues that Claim 3 provides specific improvements to targeted electronic content delivery system functionality because the DPI module samples communication traffic in a way that results in "more accurate profiling of subscriber behavior." *Id.* at 11–12 (analogizing Claim 3 to the claims in *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299 (Fed. Cir. 2018) and *Packet Intelligence LLC v. NetScout Sys., Inc.*, 965 F.3d 1299 (Fed. Cir. 2020)). Thus, according to Brazos, Claim 3 does not recite an abstract idea.

The Court finds the purported improvement captured by Claim 3 distinguishable from that deemed non-abstract by the Federal Circuit in *Finjan* and *Packet Intelligence*. In *Finjan*, the Federal Circuit determined that the claimed virus scanning method "employs a new kind of file

that enables a computer security system to do things it could not do before," thereby constituting a specific non-abstract improvement in computer functionality. *Finjan*, 879 F.3d at 1304–05. Similarly, in *Packet Intelligence*, the Federal Circuit held that claims directed to "identifying disjoined connection flows in a network environment" recited a specific technique for improving computer networks. *Packet Intelligence*, 965 F.3d at 1309–10.

Unlike the claims in *Finjan* and *Packet Intelligence*, Claim 3 is not directed to an improvement to the functionality of the computer or computer networks themselves. Rather, Claim 3 merely recites the concept of monitoring the access communication traffic, without specificity as to how this is accomplished. Brazos' motion for summary judgment briefing implicitly underscores this Court's conclusion, asserting that the DPI module "allow[s] ***targeted electronic delivery systems*** to achieve an accuracy and . . . sample communication data that 'it could not do before'" and "enable[s] ***targeted electronic content delivery systems*** to sample communication traffic in an improved way that results in more accurate profiling." ECF No. 118 at 12 (emphasis added). Brazos' opposition to Google's motion for reconsideration likewise supports this conclusion, stating that "the 'claimed advance' was ***one in web activity profiling techniques for targeted electronic content delivery systems***, not in DPI or packet traffic itself." ECF No. 179 at 3 (emphasis added). Thus, "[e]ven accepting that the claimed invention improves the specificity and relevancy of online advertisements, this is 'at most an improvement to the abstract idea of targeted advertising wherein a computer is merely used as a tool." *Chewy, Inc. v. Int'l Bus. Machs. Corp.*, 94 F.4th 1354, 1366 (Fed. Cir. 2024) (citing *Customedia*, 951 F.3d at 1365).

Brazos' opposition to Google's motion for reconsideration adds the argument that the placement of the "behavioral information collector" remote from the subscriber device supplies a non-abstract technological advance. ECF No. 179 at 3. Brazos contends that this arrangement

results in cookie-less profiling, comprehensive traffic sampling, and improved resource usage. *Id.* at 2–4. Nothing in the language of Claim 3, however, requires the placement of the "behavioral information collector" remote from the subscriber. As the Federal Circuit has held before, "[t]he breadth of the claim language . . . illustrates why any reliance on the specification in the § 101 analysis must always yield to the claim language." *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 769 (Fed. Cir. 2019). While Brazos points to parts of the specification to show Claim 3's purported technical advancements, in the end, "[t]he § 101 inquiry must focus on the language of the Asserted Claims themselves"—"the specification cannot be used to import details from the specification if those details are not claimed." *Id.* (citation omitted).

For these reasons, the Court finds Claim 3 to be directed to an abstract idea.

**ii. Claims 2, 5, and 7 are directed to an abstract idea**

Claims 2, 5, and 7 are likewise directed to an abstract idea. Claim 2 adds that "the behavioral information collector is configured to collect the behavioral information from only the one or more particular types of communication traffic in the monitored communication traffic." '806 Patent at 16:43–46. Claim 5 specifies that "the targeted electronic content comprises an advertisement." *Id.* at 16:56–57. And Claim 7 recites that the system is "implemented in a set of one or more network elements for providing to a subscriber system access to electronic content through the access network." *Id.* at 16:62–64. In short, these claims either limit the process of collecting and analyzing information to "a particular content" or "a particular source" (Claim 2), expressly claim the abstract idea of targeted advertising (Claim 5), or recite generic network "elements" (Claim 7).

Thus, the claims fail to recite anything that would advance them out of the realm of an abstract idea. *See SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1168 (Fed. Cir. 2018) ("[E]ven

if a process of collecting and analyzing information is 'limited to particular content' or a particular 'source,' that limitation does not make the collection and analysis other than abstract."); *Customedia*, 951 F.3d at 1362 ("The claims at issue here are directed to the abstract idea of using a computer to deliver targeted advertising to a user."); *Free Stream*, 996 F.3d at 1365 (claims directed to providing a user with targeted content using generic processes and machinery merely improve the abstract idea of targeted advertising and are abstract).

**C. *Alice* Step Two**

Having determined that the asserted claims are directed to the abstract idea of delivering targeted content to a subscriber under *Alice* step one, the Court proceeds to *Alice* step two analysis. In *Alice* step two, courts examine whether the claim limitations "involve more than performance of 'well-understood, routine, [and] conventional activities previously known to the industry.'" *Berkheimer*, 881 F.3d at 1367. When examining the issue of conventionality, courts must "consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements transform the nature of the claim into a patent eligible application." *SRI Int'l, Inc. v. Cisco Sys., Inc.*, 930 F.3d 1295, 1304 (Fed. Cir. 2019).

**1. Claim 1 lacks an inventive concept**

Google argues that "[v]iewing the limitations individually and as an ordered combination, claim 1 recites no more than implementing the abstract idea of delivering targeted content through generic 'hardware' on a network." ECF No. 48 at 13. Google emphasizes that the specification provides that the claimed hardware components are generic and well known. *Id.* at 14–15. Finally, Google contends that the prosecution history of the '806 Patent confirms the claims are not directed to patent-eligible subject matter because the patentee only overcame the examiner's § 101 rejection after amending Claim 1 to recite that at least one of the "behavior information collector," "behavior

analyzer," and "electronic content delivery controller" is implemented using hardware. *Id.* at 15. But because "recit[ing] specific hardware configured to perform specific computerized functions" is insufficient to render a claim patent eligible under *Alice*, this amendment adds nothing of substance to the underlying abstract idea. *Id.* at 16 (citing *Alice*, 573 U.S. at 226–27).

In response to Google's motion for summary judgment, Brazos contends that Google ignores the technical advantages and improvements described by the specification. ECF No. 50 at 17. Brazos further argues that the claims do not recite "generic components" in the abstract, and that the claim language is "tethered to disclosed technological improvements . . . *transforming* the component from merely generic or conventional functionality." *Id.* at 18. Brazos also argues that the machine-or-transformation test weighs in favor of denial. *Id.* at 19.

Brazos' arguments are unpersuasive. The Court, considering the elements of Claim 1 both individually and as an ordered combination, does not find that the claim contains anything "significantly more" than the abstract idea itself. *See Alice*, 573 U.S. at 217–18. Aside from the abstract idea of delivering targeted content to users, Claim 1 merely recites "a behavioral information collector," "a behavioral analyzer," and "an electronic content delivery controller," where "at least one [of these components] is implemented using hardware." '806 Patent at 16:2–42. The specification acknowledges that these components do not provide a technological improvement, stating that "[t]he components of the system 20 and the interconnections may be implemented in any of various ways. For example, each component may be implemented in hardware, software, firmware, or combinations thereof." *Id.* at 6:19–21; *see also, e.g., id.* at 5:11–16 (noting that the "topology" of the claimed invention is "typical of an Internet service system, wherein an Internet Service Provider (ISP) implements switches, routers, and/or other network equipment"); *id.* at 5:23–29 (stating that "access network, and core network technologies and their

operation will be familiar to those skilled in the art" and that the "present invention is not limited to any particular types of equipment, protocols, or operation").

Moreover, the claimed "behavioral information collector," "behavioral analyzer," and "electronic content delivery controller" are described in result-based functional language. *See* '806 Patent at 16:2–42. The specification states, "[g]iven the broad range of possible implementations of many of the components of the system 20, these components are described herein primarily in terms of their functions." *Id.* at 7:3–5. These elements thus fail to provide an inventive concept. *In re TLI Commc'ns Patent Litig*., 823 F.3d 607, 612 (Fed. Cir. 2016) (finding that the claims failed step two because "[t]he specification fails to provide any technical details for the tangible components, but instead predominately describes the system and methods in purely functional terms"). Here, nothing in Claim 1, understood in light of the specification, requires anything other than off-the-shelf, conventional computer and network technology for performing the claimed functions of collecting subscriber information, analyzing it, and then delivering targeted content. "Such invocations of computers and networks that are not even arguably inventive are 'insufficient to pass the test of an inventive concept in the application' of an abstract idea.'" *Elec. Power*, 830 F.3d 1350, 1355 (Fed. Cir. 2016) (citations omitted).

Thus, the Court does not find the "existence of genuine disputes of material fact [that] will preclude summary judgment in this case." *See PPS Data, LLC v. Jack Henry & Assocs.*, 404 F. Supp. 3d 1021, 1037 (E.D. Tex. 2019). As described above, the '806 Patent specification indicates that the components of Claim 1 are well-understood, routine, and conventional. *See* '806 Patent at 4:62–67, 5:11–30, 6:19–21, 7:3–8. Brazos' conclusory allegations that contradict the specification do not create a genuine dispute of material fact. *See Innovation Scis., LLC v. Amazon.com*, 778 F.

App'x 859, 864 (Fed. Cir. 2019) (finding no genuine disputes of material fact where the specification admits the claimed elements were conventional).

**2. Dependent Claims 2, 3, 5, and 7**

For the same reasons explained above, the Court first addresses Claim 3 and then Claims 2, 5, and 7.

**i. Claim 3 lacks an inventive concept[3]**

Google argues that the "behavioral information collector" and "DPI module" of Claim 3 fail to supply an inventive concept. ECF No. 161 at 8. According to Google, the "behavioral information collector" fails to add anything beyond what was held to be abstract in Claim 1. *Id.* Regarding the "DPI module," Google contends that there is no dispute that using DPI to monitor packet traffic was well known and conventional at the time the '806 Patent was filed. *Id.* at 8–10. Google further cites its expert, who opines that the elements of Claim 3 alone and in combination are still patent ineligible. *See* ECF No. 201 at 6. Google argues there is no dispute of material fact, citing portions of the patent specification and deposition testimony of Brazos' expert in support. ECF No. 161 at 8–11; ECF No. 201 at 3–6.

The Court agrees with Google that the "behavioral information collector" cannot supply the inventive concept. *See Am. Axle & Mfg., Inc. v. Neapco Holdings LLC,* 967 F.3d 1285, 1299 (Fed. Cir. 2020) ("The abstract idea itself cannot supply the inventive concept."). Likewise, the patent specification and expert testimony both support the conclusion that using DPI modules to

[3] At the time of the first hearing regarding the cross-motions for summary judgment, the parties disputed whether the "behavioral information collector" and "DPI module" of Claim 3 were routine, conventional, or well-understood, as well as whether an ordered combination supplied an inventive concept. *See* ECF No. 118 at 13–15; ECF No. 127 at 14–18; ECF No. 144 at 30:13–23. Thus, the Court found that a genuine issue of material fact existed as to whether Claim 3 recites "significantly more" than the abstract idea itself and orally ruled that the second step of *Alice* would proceed to trial. However, by the time of Google's motion for reconsideration, expert discovery had been conducted and expert reports exchanged, and the Court determined that there was no genuine issues of material fact. ECF No. 247 at 17:6–7.

monitor and analyze packet traffic was routine, well-understood, and conventional. *See, e.g.*, ’860 Patent at 6:39–42 (providing that a “DPI module used in behavioral information collection . . . might be an existing module that is also used for such functions as traffic management”); ECF No. 161-2 at 27:11–14 (plaintiff’s expert stating that deep packet inspection “was a known concept that [the inventors of the ’806 Patent] were making use of”), 48:12–15 (further agreeing that “as of 2004, deep packet inspection systems were commercially available for monitoring network packet traffic”). Thus, there is no factual dispute that the “behavioral information collector” and “DPI module” as individual elements fail to supply the inventive concept.

Brazos’ response does not contest this point. *See* ECF No. 247 at 7:8–9 (“Brazos never relied on DPI as an individual element to show no ineligibility.”). Rather, Brazos argues that “two ordered combinations” each provide an inventive concept. *Id.* at 7:13–15. First, Brazos argues that the arrangement of the DPI module and the behavioral information collector remote from the subscriber is an inventive concept. *Id.* at 7:16–18; ECF No. 179 at 6–7, 10. The Federal Circuit has recognized that the arrangements of certain elements may supply an inventive concept. For example, in *BASCOM Global Internet Services, Inc. v. AT&T Mobility LLC*, the Federal Circuit found that “the installation of a filtering tool at a specific location, remote from the end-users” is an inventive concept. 827 F.3d 1341, 1350 (Fed. Cir. 2016). Similarly, in *Cooperative Entertainment, Inc. v. Kollective Technology, Inc.*, the Federal Circuit found the arrangement of peer notes outside of controlled networks to be an inventive concept. 50 F.4th 127, 133 (Fed. Cir. 2022).

However, the inventive arrangements identified in both those cases were tethered to the language of the claims. *See BASCOM*, 827 F.3d at 1345 (claim reciting “[a] content filtering system . . . comprising: a local client computer . . . and a remote ISP server coupled to said client

computer . . . said ISP server associating each said network account to at least one filtering scheme"); *Coop. Entm't.*, 50 F.4th at 129 (claim reciting "wherein the multiplicity of peer nodes is distributed outside controlled networks and/or content distribution networks"). As explained above, nothing in the language of Claim 3 requires a location remote from the subscriber. *See supra* Part III(B)(3)(i).

Second, Brazos argues that the deployment of DPI alongside IPTV and the remote behavioral information collector is an inventive concept. ECF No. 179 at 8. Brazos' expert opines that "[t]he use of a behavioral information collector and DPI module for behavioral profiling was not routine, conventional, or well-understood as of 2006." ECF No. 161-3 at ¶ 109. Brazos' expert supports this conclusion by opining that "prior targeted electronic content delivery systems deposited cookies onto user devices and did not use behavioral information collectors or DPI modules to build behavioral profiles." *Id.*

However, Brazos' expert's opinion and Brazos' briefs make clear that the result of cookie-less profiling is due to the purported placement of the behavioral information collector remote from the subscriber device and DPI module. *See* ECF No. 161-3 at ¶¶ 107, 110; ECF No. 179 at 3. As explained above, there is no basis for this arrangement in the language of the claim; thus, it cannot supply an innovative concept. *See Two-Way Media*, 874 F.3d at 1338 ("To save a patent at step two, an inventive concept must be evident in the claims . . . . The main problem that Two-Way Media cannot overcome is that the *claim*—as opposed to something purportedly described in the specification—is missing an inventive concept."). Moreover, Brazos' argument regarding the purported cookie-less nature of the claimed targeted content delivery system is essentially that it "functions differently than prior art targeted content delivery systems," which is insufficient. *See Bridge & Post*, 778 F. App'x at 892. At most, the combined elements of Claim 3 simply narrow

or reformulate the abstract idea of delivering targeted content, which as a matter of law does not add "significantly more." *Id.* Accordingly, all that is left is Brazos' expert's conclusion that the ordered combination is not routine, well-understood, or conventional. This conclusion is not enough to create a factual dispute. Thus, the Court finds no genuine dispute of material fact that Claim 3 does not include an "inventive concept" and is therefore patent ineligible.

**ii. There is no dispute that Claims 2, 5, and 7 lack an inventive concept**

Only Google's motion for summary judgment addresses Claims 2, 5, and 7. *See* ECF No. 48 at 17–19. Brazos' opposition provides no specific analysis of these claims. *See* ECF No. 50. Considering the elements of these claims, both individually and as an ordered combination, the Court finds no dispute that these claims lack an inventive concept and are patent ineligible.

## IV. CONCLUSION

For these reasons, the Court **GRANTS** Google's motion for reconsideration as to whether Claim 3 is patent ineligible under 35 U.S.C. § 101 (ECF No. 161). The Court finds that Claims 1, 2, 3, 5, and 7 of the '806 Patent are invalid under 35 U.S.C. § 101. Accordingly, the Court **VACATES** its prior oral denial of Google's motion for summary judgment of invalidity under 35 U.S.C. § 101 as to Claim 3 and **GRANTS** summary judgment in favor of Google. The Court **DENIES** Brazos' motion for summary judgment.

**SIGNED** this 12th day of June, 2025.

ALAN D ALBRIGHT
UNITED STATES DISTRICT JUDGE

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | | |
|---|---|---|
| WSOU INVESTMENTS, LLC d/b/a BRAZOS LICENSING & DEVELOPMENT, *Plaintiff,* v. GOOGLE LLC, *Defendant.* | ) | Case No. 6:20-cv-00572-ADA |

## FINAL JUDGMENT

In accordance with the Court's Memorandum Option and Order granting summary judgment of invalidity to Defendant, it is hereby **ORDERED** and **ADJUDGED** that:

**IT IS ORDERED** that final judgment is entered in favor of Defendant and against the Plaintiff. Plaintiff shall take nothing by this action.

**IT IS FURTHER ORDERED** that the deadline for the prevailing party to seek costs and attorney fees is hereby deferred until thirty (30) days after the expiration of the time allowed for appeal of this final judgment, or if there is an appeal, until thirty (30) days after issuance of a mandate by the appellate court.

**IT IS FURTHER ORDERED** that any relief not specifically granted in this judgment is **DENIED**. This case is hereby closed.

This **FINAL JUDGMENT** starts the timing for filing an appeal.

**SIGNED** this 12th day of June, 2025.

ALAN D ALBRIGHT
UNITED STATES DISTRICT JUDGE

# EXHIBIT A

US008041806B2

(12) **United States Patent**
**Gassewitz et al.**

(10) **Patent No.: US 8,041,806 B2**
(45) **Date of Patent: Oct. 18, 2011**

(54) **TARGETED ELECTRONIC CONTENT DELIVERY CONTROL SYSTEMS AND METHODS**

(75) Inventors: **Michael Peter Gassewitz**, Ottawa (CA); **Denny Lee**, Kanata (CA); **Steven Edward Morin**, Ottawa (CA)

(73) Assignee: **Alcatel Lucent**, Paris (FR)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1221 days.

(21) Appl. No.: **11/530,519**

(22) Filed: **Sep. 11, 2006**

(65) **Prior Publication Data**

US 2008/0065759 A1 Mar. 13, 2008

(51) **Int. Cl.**
*G06F 15/16* (2006.01)
(52) **U.S. Cl.** ........................................ **709/224**
(58) **Field of Classification Search** .................. 709/224, 709/223
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,974,451 | A * | 10/1999 | Simmons | 709/218 |
| 7,337,127 | B1 * | 2/2008 | Smith et al. | 705/14 |
| 2002/0010584 | A1 * | 1/2002 | Schultz et al. | 704/270 |
| 2002/0099854 | A1 * | 7/2002 | Jorgensen | 709/249 |
| 2002/0105911 | A1 * | 8/2002 | Pruthi et al. | 370/241 |
| 2003/0207685 | A1 * | 11/2003 | Rankin | 455/433 |
| 2005/0018697 | A1 * | 1/2005 | Enns et al. | 370/401 |
| 2006/0021353 | A1 | 2/2006 | Lawlor et al. | |
| 2006/0123001 | A1 * | 6/2006 | Burns | 707/6 |
| 2006/0212353 | A1 * | 9/2006 | Roslov et al. | 705/14 |
| 2007/0022442 | A1 * | 1/2007 | Gil et al. | 725/62 |
| 2008/0140525 | A1 * | 6/2008 | Lamsfuss et al. | 705/14 |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| EP | 0 837 583 | A2 | 4/1998 |
| WO | WO 01/20481 | A2 | 3/2001 |
| WO | WO 02/17202 | A2 | 2/2002 |
| WO | WO 2006/034844 | A1 | 4/2006 |

* cited by examiner

*Primary Examiner* — Wing Chan
*Assistant Examiner* — Andrew Woo
(74) *Attorney, Agent, or Firm* — Eckert Seamans Cherin & Mellot, LLC.

(57) **ABSTRACT**

Targeted electronic content delivery control systems and methods are disclosed. All communication traffic exchanged with a communication network subscriber over an access communication link that enables the subscriber to access electronic content is monitored, and behavioral information indicative of behavior of the subscriber in using the access communication link is collected from the monitored communication traffic. A behavioral profile of the subscriber is maintained based on the behavioral information. Delivery of targeted electronic content to the subscriber for presentation with electronic content accessed by the subscriber is controlled based on the behavioral profile.

**14 Claims, 3 Drawing Sheets**




10
Subscriber
12
Subscriber
14
Access
Communication Network
16
Core
Communication Network
18

FIG. 1


20
Targeted Content Source 60
Billing Management System 62
Electronic Content Source 58
Targeted Content Campaign Manager 54
Targeted Content Database 52
Electronic Content Delivery Controller 56
Contextual Analyzer 50
Behavioral Information Collector Management System 44
Online Characterization Definitions 48
Behavioral Profile Database 46
Subscriber Information Database 40
SME Management System 42
Behavioral Information Collector 34
Behavioral Analyzer 36
Behavior Rule Definitions 38
Subscriber 22
Behavioral Information Collector 28
Subscriber Management Element (SME) 30
Behavioral Information Collector 32
26
Access Network 24

**FIG. 2**




FIG. 3




FIG. 4




FIG. 5

# TARGETED ELECTRONIC CONTENT DELIVERY CONTROL SYSTEMS AND METHODS

## FIELD OF THE INVENTION

This invention relates generally to communications and, in particular, to control of electronic content delivery to subscribers in communication networks based on subscriber behaviors.

## BACKGROUND

Those familiar with existing advertising distribution techniques will appreciate the advertising spend wastage problem. Much advertising, whether online or through traditional media, is delivered to consumers without regard to their buying intent and/or personal interests. There are three main types of existing online advertisement solutions that attempt to address this problem. These include advertisement delivery with search, advertisement delivery with content, and advertisement delivery using a behavioral network.

In an advertisement delivery with search scheme, advertisements are delivered by a search engine provider along with search results. Typically, the advertisements selected for display are contextually related to a search phrase. U.S. patent application Ser. No. 11/272,026, entitled "SYSTEMS AND METHODS FOR SELECTING DIGITAL ADVERTISEMENTS" and published on Jun. 8, 2006 as Publication No. 2006/0123001, discloses another example of a search-based system, in which digital advertisements to be sent to a user's computer are chosen based on information relating to searches conducted by the user. In this example, advertisements are related to searches, but might not necessarily be returned to the user with search results. However, search context-based advertisement delivery mechanisms do not capture the ongoing buying intent and/or other personal interests of a user.

Advertisement delivery with content involves delivering advertisements with the content of a portal, in a webpage for instance. The advertisements selected for display are normally contextually related to the content of the portal. As noted above for search context, content context analysis does not capture the ongoing buying intent and/or other personal interests of the user.

For some currently available advertisement delivery mechanisms using a behavioral network, the "network" is a limited community of cooperating portals. These portals participate as members of an "ad network". As a user visits the portals, cookies and/or web beacons can be used to track and log the user and the user's behavior within the ad network. Advertisements are selected for delivery with the content of a portal according to the identity of the user and the user's tracked behavior.

An ad network implementation requires a community of cooperating portals to be established. One problem with this type of behavioral ad network lies in the limited extent of such a network, which can lead to difficulties in tracking users. When a user traverses portals that are outside the domain of an ad network, the ad network loses the ability to track the behavior of the user, thus limiting its effectiveness. Advertisers thus cannot be certain of the accuracy of behavioral assessments, since users may have visited many sites that are not within the portal community of an ad network. In addition, further tracking problems can arise when users disable cookies.



U.S. patent application Ser. No. 09/863,593, entitled "APPARATUS AND METHOD FOR COLLECTING AND ANALYZING COMMUNICATIONS DATA" and published on Aug. 8, 2002 as Publication No. 2002/0105911, proposes a system in which packets are extracted from data received from a first communication line and statistics corresponding to the packets are then recursively generated. Although this patent application concentrates primarily on communication network management based on these statistics, reference is made to profiling data about users or their traffic on such networks. A network monitor might filter each received packet based on its contents, such as by looking for specific text within packets or for web sites visited by a user. The level of user behavioral analysis in this patent application appears to be limited, since packet content filtering techniques are not disclosed in detail. Content delivery also appears to be independent of current in-process user access activities, as is evident from the disclosed example of targeted email as a content delivery mechanism.

U.S. patent application Ser. No. 09/833,444, entitled "USER PROFILING COMMUNICATIONS SYSTEM" and published on Nov. 6, 2003 as Publication No. 2003/0207685, also discloses user profiling for a system in which a user has multiple terminals. The terminals cooperate to transfer automatically gathered user profile information, which includes service access information for accessing services. The user profiles are used for a different purpose in this published patent application, for service access rather than advertisement or other content delivery.

Thus, there remains a need for improved targeted electronic content delivery control techniques.

## SUMMARY OF THE INVENTION

Embodiments of the present invention may significantly improve an advertiser's return on investment of its advertising expenditures by delivering highly relevant targeted online advertisements and/or other electronic content to end consumers using continuous and thorough analysis of the consumers' online behaviors.

In accordance with an aspect of the invention, there is provided a system that includes a behavioral information collector operable to monitor all communication traffic exchanged with a communication network subscriber over an access communication link, the access communication link enabling the subscriber to access electronic content, and to collect from the monitored communication traffic behavioral information indicative of behavior of the subscriber in using the access communication link, a behavioral analyzer operatively coupled to the collector and operable to maintain a behavioral profile of the subscriber based on the behavioral information, and an electronic content delivery controller operatively coupled to the behavioral analyzer and operable to control, based on the behavioral profile, delivery of targeted electronic content to the subscriber for presentation with electronic content accessed by the subscriber.

The behavioral information collector may be operable to collect the behavioral information from only one or more particular types of the monitored communication traffic.

In some embodiments, the behavioral analyzer is operable to maintain the subscriber behavioral profile based on behavioral information collected from only one or more particular types of the monitored communication traffic.

Where the monitored communication traffic includes packet traffic, the system may also include a Deep Packet

Inspection (DPI) module operatively coupled to the behavioral information collector and operable to monitor the access communication traffic.

The behavioral information collector is in an offline position relative to the access communication link in some embodiments.

The system may also include a memory operatively coupled to the behavioral analyzer for storing behavioral analysis definitions, in which case the behavioral analyzer maintains the subscriber behavior profile in accordance with the stored behavioral analysis definitions.

An electronic content source may be operatively coupled to the electronic content delivery controller and operable to deliver the accessed electronic content to the subscriber. The electronic content delivery controller may then be operable to control delivery of targeted electronic content to the subscriber by providing the targeted electronic content to the electronic content source for delivery to the subscriber with the accessed electronic content.

Where the access communication link is a network link in an access network, the access network may include an electronic content source that is operable to deliver the accessed electronic content to the subscriber.

The electronic content source may provide an Internet Protocol Television (IPTV) service, for example.

In some embodiments, the electronic content delivery controller is further operable to select the targeted electronic content from targeted electronic content provided by multiple targeted electronic content providers.

The targeted electronic content may include an advertisement.

At least one of the behavioral information collector, the behavioral analyzer, and the electronic content delivery controller may be implemented in software for execution by one or more processing elements.

Such a system may be implemented, for example, in a set of one or more network elements for providing to a subscriber system access to electronic content through an access communication network.

A method is also provided, and includes monitoring all communication traffic exchanged with a communication network subscriber over an access communication link, the access communication link enabling the subscriber to access electronic content, collecting from the monitored communication traffic behavioral information indicative of behavior of the subscriber in using the access communication link, maintaining a behavioral profile of the subscriber based on the behavioral information, and controlling, based on the behavioral profile, delivery of targeted electronic content to the subscriber for presentation with electronic content accessed by the subscriber.

Collecting may involve collecting the behavioral information from only one or more particular types of the monitored communication traffic.

The operation of maintaining may involve maintaining the subscriber behavioral profile based on behavioral information collected from only one or more particular types of the monitored communication traffic.

Where the access communication link is a network link in an access network, the access network may include an electronic content source that is operable to deliver the accessed electronic content to the subscriber.

The method may also include selecting the targeted electronic content from targeted electronic content provided by multiple targeted electronic content providers.

The targeted electronic content may include an advertisement.

A method may be embodied, for example, in instructions stored on a machine-readable medium.

A machine-readable medium storing a data structure is also provided. The data structure includes information identifying a communication network subscriber, and a behavioral profile maintained for the identified subscriber based on behavioral information, which is collected from all communication traffic exchanged with the subscriber over an access communication link that enables the subscriber to access electronic content and is indicative of behavior of the subscriber in using the access communication link. The behavioral profile allows selection of targeted electronic content to be delivered to the subscriber for presentation with electronic content accessed by the subscriber.

According to another aspect of the invention, a machine-readable medium stores a data structure that includes information specifying targeted electronic content, and information specifying a behavior associated with the specified targeted electronic content. The information that specifies a behavior allows selection of the specified targeted electronic content to be delivered to a communication network subscriber, by whom the specified behavior is exhibited in using an access communication link that enables the subscriber to access electronic content, for presentation with electronic content accessed by the subscriber.

Other aspects and features of embodiments of the present invention will become apparent to those ordinarily skilled in the art upon review of the following description.

## BRIEF DESCRIPTION OF THE DRAWINGS

Examples of embodiments of the invention will now be described in greater detail with reference to the accompanying drawings.

FIG. **1** is a block diagram of a communication system.

FIG. **2** is a block diagram of a communication system incorporating behavior-based electronic content delivery control.

FIG. **3** is a flow diagram of an electronic content delivery control method.

FIGS. **4** and **5** are block diagrams of data structures.

## DETAILED DESCRIPTION OF PREFERRED EMDOBIMENTS

FIG. **1** is a block diagram of a communication system in which embodiments of the invention may be implemented. The communication system **10** in FIG. **1** includes subscriber systems **12**, **14**, an access communication network **16**, and a core communication network **18**. Although many subscriber systems **12**, **14** and access networks **16** may be connected to a core communication network **18**, only two subscriber systems and one access network have been shown in FIG. **1** to avoid overly complicating the drawing. Internal details of the subscriber systems **12**, **14** and the networks **16**, **18** have not been explicitly shown in FIG. **1** for similar reasons. It should therefore be appreciated that the system of FIG. **1**, as well as the contents of the other drawings, are intended solely for illustrative purposes, and that the present invention is in no way limited to the particular example embodiments shown in the drawings and described herein.

Those skilled in the art to which the present invention pertains will be familiar with many different types of subscriber systems **12**, **14**, access communication networks **16**, and core communication networks **18**. The present invention is not limited to any particular type of subscriber or network equipment.

In one embodiment, each subscriber system **12**, **14** is, or at least includes, a communication device through which a subscriber can exchange communication traffic with the access communication network **16**, and thus access electronic content, services, and/or other functions supported in the access communication network or in the core communication network **18**. A personal computer with a modem is one example of a subscriber system, although other types of subscriber systems, including fixed, portable, or mobile devices are also contemplated.

The topology shown in FIG. **1** is typical of an Internet service system, wherein an Internet Service Provider (ISP) implements switches, routers, and/or other network equipment as the access communication network **16** to provide its subscribers with access to the Internet as the core communication network **18**.

Electronic content, searching, shopping, and/or other functions may be supported by servers or other systems within the access communication network **16**, where an ISP provides an Internet Protocol TV (IPTV) service as a source of electronic content for instance, by servers or other systems within or connected to the core communication network **18**, or in both the access and core communication networks.

As noted above, many examples of subscriber, access network, and core network technologies and their operation will be familiar to those skilled in the art. Since the present invention is not limited to any particular types of equipment, protocols, or operation, subscriber and network equipment are described only to the extent necessary to illustrate embodiments of the invention. In one embodiment, the techniques disclosed herein are implemented in an access network such as **16**. This type of implementation is described in further detail below with reference to FIG. **2**, which is a block diagram of a communication system that incorporates behavior-based electronic content delivery control.

The system **20** of FIG. **2** includes a subscriber system **22**, which is operatively coupled to an access network **24** through an access communication link **26**. The access network **24** is operatively coupled to an electronic content source **58**, which is one example of a system that provides a function or service, in this case electronic content, to the subscriber **22**. A subscriber management element (SME) **30** is provided within the access network **24**, and is operatively coupled to the access communication link **26**. A behavioral information collector may be deployed “inline” in the access communication link **26** at the access side or network side of the SME **30**, as shown at **28** and **32**, respectively.

A behavioral information collector **34** may also or instead be provided in an “offline” position, operatively coupled to the access communication link **26** but not itself part of that link. In the example shown, the offline behavioral information collector **34** is operatively coupled to the SME **30**, although other connection schemes are also possible. A behavioral information collector management system **44** is operatively coupled to the or each behavioral information collector **28**, **32**, **34**, and to the online characterization definitions database **48**. Operative couplings between the behavioral information collector management system **44** and the behavioral information collector(s) **28**, **32** have not been shown in order to avoid overly complicating the drawing.

An SME management system **42** is operatively coupled to the SME **30** and to a subscriber information database **40**.

A behavioral analyzer **36** is operatively coupled to the or each behavioral information collector **28**, **32**, **34**, to the SME management system **42**, to an electronic content delivery controller **56**, and to databases **38**, **46**, **48**. A contextual analyzer **50** is operatively coupled to the online characterization definitions database **48**, to the electronic content delivery controller **56**, and to the electronic content source **58**.



The electronic content delivery controller **56** is further operatively coupled to the electronic content source **58**, to a billing management system **62** that is operatively coupled to one or more targeted electronic content source(s) **60** and to the electronic content source, to a targeted content campaign manager **54** that is also operatively coupled to the targeted electronic content source(s), and to a targeted electronic content database **52** that is maintained by the targeted electronic content source(s).

It should be appreciated that the system **20** represents one illustrative example of an embodiment of the invention. Other embodiments may include fewer, further, or different components, with similar or different interconnections, than shown.

The components of the system **20** and the interconnections between those components may be implemented in any of various ways. For example, each component may be implemented in hardware, software, firmware, or combinations thereof. Connections between components may include local connections such as physical cables or conductors and/or logical couplings through commonly accessed variables or memory areas where components are implemented in the same equipment, such as on one computer or network device. Longer range connections such as wired or wireless network connections may be used to couple remote components together for operation.

In one embodiment, the SME **30** is implemented in a Remote Access Server (RAS), a Broadband RAS (BRAS), or a set of routers and/or switches with subscriber management functions that acts as a distributed BRAS. A behavioral information collector might be a standalone network element that is placed in an inline position **28**, **32** with the SME **30** in an access communication link **26** or in an adjunct position **34**, as shown, or integrated as part of the SME **30**. The collection function of the behavioral information collector, described in further detail below, could be implemented as an extended Deep Packet Inspection (DPI) platform. A DPI module used in behavioral information collection could be provided specifically for this purpose, or might be an existing module that is also used for such functions as traffic management. In one embodiment, a behavioral information collector includes some form of DPI technology. A DPI module may allow information contained in any one or more of Layers 3 to 7 of the Open Systems Interconnection (OSI) Reference Model to be examined and analyzed, for example.

The SME management system **42** and the behavior information collector management system **44** could be implemented as management software for execution by one or more processing elements, illustratively on the same or different servers. The overall infrastructure that handles and manages electronic content delivery in the system **20**, including the components **36**, **50**, **54**, **56**, **58**, **60**, **62**, could similarly be implemented as software for execution on one or more servers.

Depending on the scale of a deployment, the functions supported by the components of FIG. **2**, as described in detail below, could be distributed across multiple processing elements, such as a set of servers. Different divisions of function than the example shown in FIG. **2** are also contemplated, such that any single component could itself be distributed across multiple servers. Any server or other processing element could also or instead perform the functions of several components. One server might support both the targeted content campaign manager **54** and the billing management system **62**, for instance. Thus, as noted above, embodiments of the inven-

tion could be implemented with further, fewer, or different components than explicitly shown.

Given the broad range of possible implementations of many of the components of the system **20**, these components are described herein primarily in terms of their functions. Based on the functional descriptions, a person skilled in the art would be enabled to implement the invention in any of various ways.

The databases **38**, **40**, **46**, **48**, **52**, however, would likely be implemented using one or more physical memory devices. Solid state memory devices are common in communication and processing equipment, although other types of memory devices, for use with fixed, movable, or even removable storage media, may also or instead be used. Each database may be stored in a respective different memory device, although multiple databases could be stored in a single memory device. The databases **38**, **46**, **48**, for example, are all used by the behavioral analyzer **36**, and thus could be stored in one memory device that is accessible to the behavioral analyzer.

In the system **20**, several entities participate within the example operational framework. These entities include one or more subscribers, one of which is represented at **22**, one or more sources of targeted electronic content, one of which is represented at **60**, and an electronic content source **58**. The access network **24** enables interactions between these entities.

The subscriber **22** is in some embodiments an Internet service subscriber, or more generally a subscriber to a service offered by the access network **24**. Any of various physical access mechanisms could be used by the subscriber **22** and supported by the access network **24** to establish the access connection **26**, including Digital Subscriber Line (DSL), Cable Modem, Dialup, or any other physical access means. A subscriber **22** is typically a household. One advantage of some embodiments of the invention is that no changes at subscriber systems are necessary. Subscriber systems do not require any modifications to support behavior tracking, additional content processing capabilities, or other functions.

The electronic content source **58**, another participant in the system **20**, represents any electronic content publisher such as a traditional portal (webpage), a video content provider, etc. An electronic content source could also or instead be implemented within the access network **24**. An ISP might host its own IPTV service, for example. Thus, embodiments of the invention may control delivery of targeted content for presentation to a subscriber, illustratively via a display screen or other output device, with other electronic content from electronic content sources that are internal to or external from an access network.

Electronic content sources such as **58** might allocate advertisement inventory such as spaces or timeslots in their electronic content for inserting targeted electronic content, illustratively advertisements. Advertisements are one example of targeted electronic content for which delivery is controlled in accordance with an aspect of the invention.

A source of targeted electronic content is represented in FIG. **2** at **60**. An advertiser, which would be one example of a provider of targeted electronic content, reaches and promotes its products to consumers, the subscriber **22** in the system **20**, through online advertising.

Interactions between the subscriber **22** and the electronic content source **58** are enabled by the access communication link **26** through the access network **24**. The access network **24** might provide the subscriber **22** with access to the Internet, for example. In a typical ISP scenario, all of the online traffic that is exchanged with the subscriber **22** traverses the access communication link **26**. This would be the case whether an electronic content source or other system by which a subscriber-accessible function is supported is internal to or external from the access network **24**.

Within the access network **24**, the SME **30** provides subscriber management functions. These functions might include authentication/authorization/accounting (AAA), policy enforcement, addressing control, etc. The SME **30** is typically managed by an SME management system **42**, through which subscriber information can be stored in and retrieved from the subscriber information database **40**. In practice, the SME **30** could be implemented in a RAS, a BRAS, or a distributed BRAS, such as those found in advanced "triple play" access network architectures.

The main function of a behavioral information collector, whether deployed at an inline position **28**, **32** or an offline position **34**, is to monitor all communication traffic flows of the subscriber **22**. Offline or adjunct placement of a behavioral information collector provides improved network survivability in case of a collector failure.

Behavioral information indicative of subscriber behavior in using the access communication link is collected from at least some of the monitored communication traffic. By operatively coupling a behavioral information collector to an access communication link, all subscriber traffic can be monitored. Although all subscriber traffic could potentially be used to collect behavioral information, this behavioral information need not necessarily be collected from all of the traffic.

Through the behavioral information collector management system **44**, a behavioral information collector could be configured to collect behavioral information from only certain types of traffic and/or to inspect monitored traffic for specific data or particular fields. For example, a behavioral information collector could inspect all subscriber traffic to identify visited Uniform Resource Locators (URLs), search phrases and search result click-through, upstream keywords, downstream electronic content, online web usage patterns, online applications, etc. Other aspects of behavioral information collector operation may similarly be configured or otherwise managed through the behavioral information collector management system **44**.

According to one embodiment, the types of behavioral information that are to be included in behavioral analysis are specified in the online characterization definitions database **48**, and the behavioral information collector management system **44** accesses these definitions and configures the behavioral information collector(s) accordingly. A behavioral information collector could also or instead be operatively coupled to the online characterization definitions database **48** to directly access the definitions.

Collected behavioral information may be aggregated together as behavioral metadata and forwarded to the behavioral analyzer **36** for further analysis. Collected behavioral information may be forwarded to the behavioral analyzer **36** automatically as it is collected, at certain intervals as aggregated behavioral metadata for instance, when explicitly requested by the behavioral analyzer, or in accordance with some other collection/reporting scheme.

The behavioral analyzer **36** receives the collected behavioral information from the behavioral information collector **28**, **32**, **34**, and formulates a view of the subscriber's behavior. A behavioral profile may be maintained in the behavioral profile database **46** by the behavioral analyzer **36**. An example of a data structure that may be used to store behavioral profiles is described below with reference to FIG. **4**.

If a profile for a subscriber already exists in the database **46**, then the existing profile may be updated to reflect ongoing subscriber behavior, which may change over time. A sub-

scriber might visit product information and shopping sites to obtain information regarding features and/or prices of a particular product or type of product that is being considered for purchase. Once a purchase is actually made, however, the subscriber might no longer be interested in product information and thus not subsequently access electronic content that relates to the product or product type. This change in behavior could be detected from online traffic on the access communication link **26** and reported to the behavioral analyzer **36**, which may then update the subscriber's profile accordingly.

Maintaining a subscriber behavioral profile may also involve creating a profile in the database **46** for a new subscriber.

According to an embodiment of the invention, behavioral profiles are maintained in accordance with online characterization definitions **48** and behavior rule definitions **38**. These definitions are collectively referenced herein as behavior analysis definitions.

Online characterization definitions may indicate, for example, the types of traffic or information that is to be used in maintaining subscriber behavioral profiles. Such definitions might include URL, webpage context categorization, email traffic, search phrase monitoring, online application signature, etc. These definitions could be applied by either the behavioral information collector **28**, **32**, **34** to govern information collection, or by the behavioral analyzer **36**, as shown, to control the particular collected information that is included in behavioral analysis.

Behavior rule definitions specify an analysis algorithm, or the manner in which collected information is actually analyzed to generate and/or update behavior profiles. These rule definitions may thus define the categorization of behaviors. If, for example, a behavior of interest is commerce-related, one might choose to define behavioral interest based on industry segments, such as automotive, financial services, retail, sports, travel, entertainment, garment, etc.

The databases **46**, **48** may be populated during initial system configuration and/or updated from time to time. The behavioral information collector management system **44** might be used to populate or update online characterization definitions in the database **48**, for example. Behavior rule definitions in the database **38** could be populated or updated through another system or user interface, illustratively a user interface for configuring the behavioral analyzer **36**. Other configuration options, using an overall system manager for instance, are also possible.

The online characterization definitions and the behavior rule definitions may be "global", and applied to all subscribers of an ISP, for example, or specific to particular subscribers or groups of subscribers. Thus, more than one collection/analysis scheme may be supported in some embodiments.

The behavioral analyzer **36** may also obtain subscriber information from the SME management system **42** so as to correlate collected behavioral information and associate the collected information and/or a behavioral profile with a unique subscriber. A behavioral analysis algorithm may entail analysis of both collected behavioral information and subscriber information, such as demographic information, obtained from the subscriber information database **40** through the SME management system **42** in the system **20**. References herein to maintaining behavioral profiles based on collected behavioral information should be interpreted accordingly.

For the purpose of matching targeted electronic content such as advertisements to subscribers that exhibit behaviors for which such targeted electronic content might be of interest, behavioral profiles may be generally commerce-related, and reflect the current buying intent, personal interests, and/or at which particular point in a buying cycle a subscriber is currently likely to be.

Indications of subscriber profiles may be provided by the behavioral analyzer **36** to the electronic content delivery controller **56**. In one embodiment, based on a subscriber's behavioral profile, subscriber behavioral tracking tags are forwarded to the electronic content delivery controller **56**, by which targeted electronic content is matched to the subscriber's behavior. It should be appreciated, however, that the electronic content delivery controller might instead poll the behavioral analyzer **36** for behavioral profile indications or access the behavioral profiles in the database **46**. Other options for distribution of behavioral profiles or profile information may be or become apparent to those skilled in the art.

The electronic content delivery controller **56** is responsible for managing the delivery of targeted electronic content, which could be the most relevant advertisements, to a subscriber. The delivery process is "indirect" in the system **20**, in that targeted electronic content stored in the database **52** by the targeted electronic content source(s) **60** is provided to the electronic content source **58** for delivery to the subscriber **22** with other electronic content that is being sent to the subscriber. Direct delivery mechanisms, in which targeted electronic content is sent directly from the electronic content delivery controller **56** to a subscriber, are also contemplated.

The electronic content delivery controller **56** selects targeted electronic content, for delivery to the subscriber through the access communication network **24** based on a visiting subscriber's identity and current behaviors, as reflected in the subscriber behavioral profile. A visiting subscriber ID, such as its source IP address and/or other identifier(s), could be sent by the electronic content source **58** to the electronic content delivery controller **56**. The visiting subscriber's behaviors are then obtained by the electronic content delivery controller **56** from the behavioral analyzer **36** or the database **46**, illustratively in the form of subscriber behavioral tracking tags. Subscriber behavior is compared against targeted electronic content stored in the database **52**. The database **52** might contain advertisement creative for instance, i.e., an advertisement itself. Advertisements might include one or more of text, image, and video. For click-through based advertisements or other targeted content, an associated click-through URL may also be stored in the database **52**.

A set of one or more pieces of relevant targeted electronic content is retrieved from the database **52** and forwarded to the electronic content source **58** for delivery to the subscriber **22**. In the example of an Internet-based portal, the targeted content is pushed, along with the contents of the portal, to the subscriber's browser for display.

According to a direct delivery mechanism, targeted electronic content is sent to a subscriber for presentation with other electronic content, but need not necessarily be delivery along with the other content. A subscriber might access a web page, for example, that includes content from a particular portal, and advertisement slots within the web page could then be filled by sending advertisements directly to the subscriber's browser, without interacting with the portal.

In the event of a failure to identify behaviorally-matched targeted electronic content in the database **52**, the electronic content delivery controller **56** may provide contextually related content to the electronic content source **58** for delivery to the subscriber **22**, based on an output from the contextual analyzer **50**.

It is possible that an electronic content source might choose to intentionally allocate some space for behaviorally targeted

content, and other space for contextual content. Moreover, the electronic content delivery controller **56** could control and deliver a diverse set of advertisements and/or other targeted electronic content based on different synthesized traits of behavior associated with a particular subscriber. According to another scheme, the electronic content delivery controller **56** might be configured to also or instead provide non-behaviorally targeted electronic content to the electronic content source **58** so as to minimize the consumer "turn-off" factor that is sometimes associated with targeted advertising for instance.

In the case of a click-through based delivery model, any targeted content click on an electronic content provider webpage is reported to the electronic content delivery controller **56**, directly or by the electronic content source **58**, and registered by the electronic content delivery controller. In addition, a record of the click is sent by the electronic content delivery controller **56** to the billing management system **62** for tracking.

The electronic content delivery controller **56** may also be responsible for providing a click-fraud analysis function in some embodiments. Suspicious clicks or click patterns may be filtered out to ensure proper accountability to the targeted electronic content source(s) **60**, for instance.

For impression based targeted content, billing is generally dependent only upon content delivery. The electronic content delivery controller **56** might thus provide a delivery indication to the billing management system **62** when impression based targeted content is delivered to a subscriber.

Several other components may cooperate with the electronic content delivery controller **56** in the targeted electronic content selection process. The contextual analyzer **50**, for example, examines and analyzes the electronic content of the source **58**, illustratively the content of a webpage accessed by the subscriber **22**. The analysis results are sent to the electronic content delivery controller **56**, via context tags for instance. The context analysis function is associated with some or all of the online characterization definitions **48** in the system **20**. These definitions may thus be used not only for subscriber behavioral information collection and/or behavior profiling, but also for context analysis.

The targeted content campaign manager **54** provides an interface to the targeted electronic content source(s) **60** for controlling an overall distribution campaign. A campaign can be either click-through based or impression based. The targeted content campaign manager contains the mechanism to allow the targeted electronic content source(s) **60** to associate certain targeted content with one or more particular behavior definitions. It may also allow each targeted electronic content source **60** to control a bid associated with a campaign. Such an association can be at an individual advertisement level or at a group level for a set of multiple pieces of targeted content such as advertisements. A bid for a targeted content slot may be based on a cost-per-thousand-impression (CPM) model or on a cost-per-click (CPC) model that uses a ranking mechanism intended to maximize click-through rate, for example. It should be noted that bidding for targeted content spots, or more generally for the opportunity to provide targeted electronic content to a subscriber, is an optional feature that might not be provided in all embodiments.

The billing management system **62** provides monitoring, tracking, and delivery of billing information to the targeted electronic content source(s) **60** and to the electronic content source **58**. Based on click-through and/or impression delivery, as reported to the billing management system **62** by the electronic content source **58** and/or the electronic content delivery controller **56**, billing records associated with a particular campaign are updated. Periodically, invoices associated with a campaign can be issued to the targeted electronic content source(s) **60** for payment. In turn, an appropriate level of payment for revenue sharing can be issued to the electronic content source **58** periodically.

Having described the components of FIG. **2** and their respective functions, operation of the system **20** can now be considered in further detail by way of an illustrative example, referred to below as "TADA" (Targeted Ad Delivery Architecture). TADA can be implemented and operated natively by an ISP or by a third party entity.

Advertisers choosing to utilize the TADA mechanism would participate by first designing and controlling a campaign to distribute targeted electronic content, illustratively an advertising campaign. In the system **20**, the targeted content campaign manager **54** provides campaign management functions, although in other embodiments these functions might be integrated with an advertiser system or some other component. Each campaign might have multiple associated advertisements.

The advertisements can be in any of multiple formats. Each advertisement, as determined by the advertiser, can be associated with one or more sets of behaviors. Behaviors may be selectable by an advertiser, having been previously designed and determined by the TADA operator, for example. Behavior definition design should provide maximal flexibility for participating advertisers, to allow them the best possible behavioral targeting and maximum return on investment and sales conversion results. This behavior definition design can be optimized and refined over time, with advertisers possibly having the opportunity to update behavior selections as definitions are expanded or otherwise revised. A data structure that could be used to map advertisements or other targeted electronic content to one or more behaviors is described below with reference to FIG. **5**.

Advertisement-to-behavior-definition associations are configured during the campaign management process. The physical creative for each advertisement is then deposited into the database **52** for storage, and subsequent selection for delivery to the subscriber **22**.

Electronic content sources such as online publishers that choose to utilize the TADA for feeding advertisements through their webpage and/or other content such as video streams allocate space within their website property or content. In the case of a video stream, video timeslots may be allocated for advertisement insertion. The advertisement spots might contain software (i.e., code) which directs a web browser to obtain advertisements from the electronic content delivery controller **56** of the TADA. When a particular subscriber visits the electronic content source **58** website, the visitor's identifier such as its source IP address is sent to the electronic content delivery controller **56**. The electronic content delivery controller **56** then looks up the associated behaviors from the behavioral analyzer **36** or the database **46** for that particular visiting subscriber, and determines the exhibited subscriber behavior traits for which advertisers are interested in delivering an advertisement. This determination is made by examining the behaviors the advertisers have declared to be of interest as part of their advertising campaign definitions. Where each advertisement is declared by its advertiser to be CPM- or CPC-based and advertisement spots are similarly declared by electronic content sources, the electronic content delivery controller **56** matches each advertisement type to a corresponding type of advertisement spot.

In conjunction with selection criteria, such as the level of a bid in some embodiments, and possibly the history of click-through in the case of CPC advertisement, a "winning" adver-

tiser and/or advertisement is declared by the electronic content delivery controller **56**, and an advertisement is delivered to the subscriber, directly or through the electronic content source **58**. If there is no behavioral match, then a contextual based advertisement might be selected.

Subsequent to the advertisement delivery and for the case of CPC advertisements, a click-through initiated from the subscriber's browser is reported to the electronic content delivery controller **56** by the electronic content source **58**.

The act of delivering an advertisement or a click-through registration is then sent to the billing management system **62** for billing purposes. Periodically, the billing management system **62** may send out invoices to advertisers as well as payment to TADA content providers. Billing management could be a fully automated, semi-automated, or fully manual process.

From the subscriber perspective, there is no change in typical online usage experience. TADA does not require special hardware or software in any subscriber systems. Since the subscriber's online traffic traverses the access network **24**, the traffic is being monitored by the behavioral information collector **28**, **32**, **34**.

The behavioral information collector **28**, **32**, **34** may look for one or more of contexts of web destinations, online traffic patterns, search interests, and other online traffic signatures. Collected behavioral information is sent to the behavioral analyzer **36**, illustratively on every online transaction, which could be a single transaction like a simple URL for a webpage or a group of transactions like a search-then-click-through sequence. The behavioral analyzer **36** then correlates the collected behavioral information and associates it with a subscriber. The behavioral information is also processed by a behavioral synthesizing function within the behavioral analyzer **36** to formulate a view of the subscriber's behaviors.

The synthesizing function may be exercised continuously as more and more behavioral information is collected. The subscriber behavior view is therefore refreshed and updated all the time. As the subscriber visits a TADA-based electronic content source or streams TADA-based video, for example, the electronic content delivery controller **56** may query the behavioral analyzer **36** or otherwise obtain the visiting subscriber's current behavior view. As described above, this view is then used to select advertisers and advertisements that are interested in targeting this type of subscriber behavior, thus completing the overall TADA operation.

Although described above primarily in the context of the system **20**, embodiments of the invention may be implemented in methods and/or data structures. Such embodiments are described below with reference to FIGS. **3** to **5**.

FIG. **3** is a flow diagram of an electronic content delivery control method. The method **70** includes monitoring, at **72**, all communication traffic exchanged with a communication network subscriber over an access communication link. The access communication link enables the subscriber to access electronic content. At **74**, behavioral information indicative of behavior of the subscriber in using the access communication link is collected from the monitored communication traffic. A behavioral profile of the subscriber is maintained at **76** based on the behavioral information. Based on the behavioral profile, delivery of targeted electronic content to the subscriber, for presentation with electronic content that is accessed by the subscriber, is controlled at **78**.

The method **70** represents one illustrative embodiment of the invention. Other embodiments may involve fewer, further, or additional operations and/or performing operations in a different order than shown. For example, traffic monitoring, behavioral information collection, and profile maintenance may be ongoing operations, as indicated by the dashed arrow returning from **76** to **72**. Targeted content delivery at **78** may be subsequently initiated when a subscriber visits an electronic content source or otherwise accesses electronic content.

Other variations of the method **70** may be or become apparent to those skilled in the art, based on the foregoing description of the system **20**, for example.

FIG. **4** is a block diagram of a data structure that may be used to store behavioral profiles on a machine-readable medium, in the database **46** (FIG. **2**) for instance.

The data structure **80** includes a subscriber identifier field **82**, a subscriber behavioral profile field **84**, and a field **86** for storing other subscriber and/or behavior information.

The subscriber identifier field **82** stores information, illustratively an IP address, which identifies a communication network subscriber. The profile field **84** stores a behavioral profile that is maintained for the identified subscriber based on behavioral information, which is collected from all communication traffic exchanged with the subscriber over an access communication link that enables the subscriber to access electronic content and is indicative of behavior of the subscriber in usage of the access communication link. The behavioral profile stored at **84** allows targeted electronic content to be selected for delivery to the subscriber with electronic content accessed by the subscriber.

FIG. **5** is a block diagram of a data structure that could be used in some embodiments to map targeted electronic content to particular behaviors. Such a data structure might be stored in the data database **52** (FIG. **2**), for example.

The data structure **90** includes a targeted content field **92** and a behavior field **94**, and may also include other content- or behavior-related information. The targeted content field **92** includes information that specifies targeted electronic content. This information may include the actual content, or possibly an identifier of the content, illustratively a pointer to a memory location at which the content is stored. The behavior field **94** includes information that specifies one or more behaviors of interest for the targeted content. Behaviors might be specified using names and/or other identifiers that are also used in behavioral profiles, so as to allow targeted content to be selected for delivery to a subscriber who exhibits a behavior of interest. Mappings between targeted content and multiple behaviors may be specified in a single data structure **90**, as shown, or in respective separate data structures for each behavior.

Data structures according to other embodiments of the invention may include further or fewer data fields than shown in FIGS. **4** and **5**, in a similar or different order. Other types of data structures may also be provided to store, for example, subscriber information and/or definitions.

Embodiments of the invention may allow advertisers to deliver highly targeted advertisements to end consumers through online publishers' webpages or timeslots within video streams. A subscriber behavior inspection element may be deployed within an access network to continuously monitor and inspect all subscriber traffic, to thereby collect information that provides the basis for synthesizing behavior profiles of Internet subscribers, for example. As a subscriber visits an online publisher or streams an ad-supported video, tightly matched advertisements can be delivered in accordance with the exhibited behaviors, such as the ongoing buying intent and/or personal interests of the subscriber. If a behavioral match is not made, a context-based advertisement could be delivered as a default.

Advertisements can be of any format, including one or more of text, image, and video. An electronic content source

through which targeted electronic content, in some embodiments advertisements, can be a traditional portal in which space has been allocated for advertisements, a video content provider that has allocated video advertisement spots before, during, or after a video stream, or some other type of provider of electronic content. The electronic content delivery control model can also be easily adopted for video download. As described above, advertisement delivery can be click-through based or simply impression based.

One possible advantage that may be provided by embodiments of the invention is better click-through and sales conversion. By gaining knowledge of a subscriber's buying intent and their personal interests, advertisers can more precisely apply their advertising dollars towards consumers that might be most likely to purchase their products. Context-based targeting does not inherently track ongoing consumer behaviors, and many advertisement selections are based on "inference" of context, such as search phrase or contents.

Traditional behavioral ad networks that rely on cookies being accepted and deposited in a subscriber's computer are vulnerable to subscribers' disabling of cookies, thus removing the ad network's ability to track subscriber behavior. The techniques disclosed herein do not depend on any special hardware, firmware, or software arrangements, including cookies, on the subscriber's computer.

As well, the ability of a conventional behavioral ad network to synthesize a subscriber's behavior is highly dependent on the scale of its "network" of portals. An ad network might be able to profile only a small percentage of a subscriber's online traffic. This restriction can severely inhibit the development of a precise behavioral understanding of the subscriber. In contrast, the techniques disclosed herein may utilize network elements that monitor all of a subscriber's traffic flow. As such, a precise behavioral profile can be obtained for the purpose of matching targeted electronic content to the interests of a subscriber.

Some traditional behavioral ad networks can also profile a subscriber based only on a certain traffic type, i.e., HyperText Transfer Protocol (HTTP) web traffic. In contrast, embodiments of the invention may be configured to profile all of the online traffic of a subscriber, including, for example, URL, HTML, Really Simple Syndication (RSS) feeds, search phrase and sequence, click-through patterns, online application signature, etc.

In order to increase the base of subscribers to which targeted electronic content delivery can be controlled, multiple access network operators such as ISPs could cooperate as an aggregated consortium. Such a consortium would represent a significantly larger subscriber base and thus a much wider reach, and could also provide for advertisers a single point of purchase of advertising space over multiple subscriber bases.

Traditional telecom equipment providers are constantly looking for ways to improve service providers' values in delivery of Internet services, for example. Embodiments of the invention may allow ISPs to actively derive revenues from the online advertisement market by providing behaviorally targeted advertisement delivery services for advertisers.

What has been described is merely illustrative of the application of principles of embodiments of the invention. Other arrangements and methods can be implemented by those skilled in the art without departing from the scope of the present invention.

For example, although described primarily in the context of methods and systems, other implementations of the invention are also contemplated, as instructions stored on a machine-readable medium.

We claim:

**1**. A system comprising:

a behavioral information collector operable to monitor communication traffic exchanged with a communication network subscriber over an access communication link, the access communication link enabling the subscriber to access electronic content, the behavioral information collector being configurable to collect from any of a plurality of types of communication traffic in the monitored communication traffic behavioral information indicative of behavior of the subscriber in using the access communication link;

a behavioral analyzer operatively coupled to the behavioral information collector and operable to maintain a behavioral profile of the subscriber that reflects ongoing behavior of the subscriber, based on behavioral information collected from only one or more particular types of the plurality of types of communication traffic in the monitored communication traffic, maintenance of the behavioral profile being unaffected by behavioral information collected from types of communication traffic other than the one or more particular types of communication traffic; and

an electronic content delivery controller operatively coupled to the behavioral analyzer and operable to control, based on the behavioral profile, delivery of targeted electronic content to the subscriber for presentation with electronic content accessed by the subscriber,

wherein at least one of the behavioral information collector, the behavioral analyzer, and the electronic content delivery controller is implemented using hardware,

wherein the access communication link comprises a network link in an access network, the access network comprising an electronic content source that is operable to deliver the accessed electronic content to the subscriber,

wherein the electronic content source provides an Internet Protocol Television (IPTV) service, and

wherein the electronic content delivery controller is further operable to select the targeted electronic content from targeted electronic content provided by multiple targeted electronic content providers.

**2**. The system of claim **1**, wherein the behavioral information collector is configured to collect the behavioral information from only the one or more particular types of communication traffic in the monitored communication traffic.

**3**. The system of claim **1**, wherein the monitored communication traffic comprises packet traffic, the system further comprising:

a Deep Packet Inspection (DPI) module operatively coupled to the behavioral information collector and operable to monitor the access communication traffic.

**4**. The system of claim **1**, wherein the behavioral information collector is in an offline position relative to the access communication link.

**5**. The system of claim **1**, wherein the targeted electronic content comprises an advertisement.

**6**. The system of claim **1**, wherein at least one of the behavioral information collector, the behavioral analyzer, and the electronic content delivery controller is implemented in software for execution by one or more processing elements.

**7**. The system of claim **1**, implemented in a set of one or more network elements for providing to a subscriber system access to electronic content through the access network.

**8**. The system of claim **1**, wherein the one or more particular types of communication traffic are indicated in an online characterization definition.

9. A system comprising:

a behavioral information collector operable to monitor communication traffic exchanged with a communication network subscriber over an access communication link, the access communication link enabling the subscriber to access electronic content, and to collect from the monitored communication traffic behavioral information indicative of behavior of the subscriber in using the access communication link;

a behavioral analyzer operatively coupled to the collector and operable to maintain a behavioral profile of the subscriber based on the behavioral information;

an electronic content delivery controller operatively coupled to the behavioral analyzer and operable to control, based on the behavioral profile, delivery of targeted electronic content to the subscriber for presentation with electronic content accessed by the subscriber; and

a memory operatively coupled to the behavioral analyzer for storing behavioral analysis definitions,

wherein the behavioral analyzer maintains the subscriber behavioral profile by creating or updating the subscriber behavioral profile in accordance with the stored behavioral analysis definitions, the behavioral analysis definitions indicating types of communication traffic or behavioral information to be used in maintaining the behavioral profile, and the manner in which the behavioral information is analyzed to maintain the behavioral profile,

wherein the access communication link comprises a network link in an access network, the access network comprising an electronic content source that is operable to deliver the accessed electronic content to the subscriber,

wherein the electronic content source provides an Internet Protocol Television (IPTV) service, and

wherein the electronic content delivery controller is further operable to select the targeted electronic content from targeted electronic content provided by multiple targeted electronic content providers.

10. A system comprising:

a behavioral information collector operable to monitor communication traffic exchanged with a communication network subscriber over an access communication link, the access communication link enabling the subscriber to access electronic content, and to collect from the monitored communication traffic behavioral information indicative of behavior of the subscriber in using the access communication link;

a behavioral analyzer operatively coupled to the collector and operable to maintain a behavioral profile of the subscriber based on the behavioral information;

an electronic content source operable to deliver to the subscriber electronic content that is accessed by the subscriber;

a source of targeted electronic content, the targeted electronic content comprising electronic content for delivery to subscribers exhibiting one or more behaviors of interest,

an electronic content delivery controller operatively coupled to the behavioral analyzer, to the electronic content source, and to the source of targeted electronic content and operable to control, based on the behavioral profile and the one or more behaviors of interest, delivery of targeted electronic content from the source of targeted electronic content to the subscriber for presentation with the accessed electronic content by providing the targeted electronic content to the electronic content source for delivery to the subscriber with the accessed electronic content,

wherein at least one of the behavioral information collector, the behavioral analyzer, the electronic content delivery controller, and the electronic content source is implemented using hardware,

wherein the access communication link comprises a network link in an access network, the access network comprising the electronic content source that is operable to deliver the accessed electronic content to the subscriber,

wherein the electronic content source provides an Internet Protocol Television (IPTV) service, and

wherein the electronic content delivery controller is further operable to select the targeted electronic content from targeted electronic content provided by multiple targeted electronic content providers.

11. A method comprising:

monitoring, by a behavioral information collector, communication traffic exchanged with a communication network subscriber over an access communication link, the access communication link enabling the subscriber to access electronic content;

collecting, by the behavioral information collector, from the monitored communication traffic behavioral information indicative of behavior of the subscriber in using the access communication link, the behavioral information collector being configurable to collect the behavioral information from any of a plurality of types of communication traffic in the monitored communication traffic;

maintaining, by a behavioral analyzer, a behavioral profile of the subscriber that reflects ongoing behavior of the subscriber, based on behavioral information collected from only one or more particular types of the plurality of types of communication traffic in the monitored communication traffic, the maintaining of the behavioral profile being unaffected by behavioral information collected from types of communication traffic other than the one or more particular types of communication traffic; and

controlling, by an electronic content delivery controller, based on the behavioral profile, delivery of targeted electronic content to the subscriber for presentation with electronic content accessed by the subscriber,

wherein at least one of the behavioral information collector, the behavioral analyzer, and the electronic content delivery controller is implemented using hardware,

wherein the access communication link comprises a network link in an access network, the access network comprising an electronic content source that is operable to deliver the accessed electronic content to the subscriber and provides an Internet Protocol Television (IPTV) service, and

wherein the method further comprises:

selecting, by the electronic content delivery controller, the targeted electronic content from targeted electronic content provided by multiple targeted electronic content providers.

12. The method of claim **11** wherein collecting comprises collecting the behavioral information from only the one or more particular types of communication traffic in the monitored communication traffic.

13. The method of claim **11**, wherein the targeted electronic content comprises an advertisement.

**14**. A non-transitory machine-readable medium storing instructions which when executed perform a method comprising:

monitoring communication traffic exchanged with a communication network subscriber over an access communication link, the access communication link enabling the subscriber to access electronic content;

collecting from the monitored communication traffic behavioral information indicative of behavior of the subscriber in using the access communication link, the collecting comprising collecting the behavioral information from any of a plurality of types of communication traffic in the monitored communication traffic;

maintaining a behavioral profile of the subscriber that reflects ongoing behavior of the subscriber, based on behavioral information collected from only one or more particular types of the plurality of types of communication traffic in the monitored communication traffic, the maintaining of the behavioral profile being unaffected by behavioral information collected from types of communication traffic other than the one or more particular types of communication traffic; and



controlling based on the behavioral profile, delivery of targeted electronic content to the subscriber for presentation with electronic content accessed by the subscriber,

wherein the access communication link comprises a network link in an access network, the access network comprising an electronic content source that is operable to deliver the accessed electronic content to the subscriber and provides an Internet Protocol Television (IPTV) service, and

wherein the method further comprises:

selecting the targeted electronic content from targeted electronic content provided by multiple targeted electronic content providers.

* * * * *

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2025-1933

**Short Case Caption:** WSOU Investments LLC v. Google LLC

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

- [x] the filing has been prepared using a proportionally-spaced typeface and includes 7,566 words.
- [ ] the filing has been prepared using a monospaced typeface and includes __________ lines of text.
- [ ] the filing contains __________ pages / __________ words / __________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. __________).

Date: 11/13/2025

Signature: /s/ Joseph M. Abraham

Name: Joseph M. Abraham